Argued January 25, affirmed May 2, petition for rehearing
denied May 29, 1956

# McPHERSON ET AL v. PACIFIC POWER & LIGHT COMPANY

296 P. 2d 932

*Walter H. Evans,* Portland, argued the cause for appellants. On the briefs were Husband, Fort & Johnson, Eugene, Krause, Evans & Lindsay, Portland, and Jack L. Kennedy, Portland.

*Francis F. Hill,* Portland, argued the cause for respondent. On the brief were Gerald J. Norville, Portland, and Smith, Gray, Hill & Rodgers, Portland.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND, LATOURETTE and PERRY, Justices.

PERRY, J.

This is a class suit brought on behalf of approximately 50,000 electric power consumers in defendant's Willamette and Coos Bay Divisions against the Mountain States Power Company to recover the amount of a surcharge which was imposed and collected by the defendant utility during December of 1952 and the spring of 1953, and to restrain and enjoin defendant from collecting any further sums over and above its lawful rates and schedules. From an order of the trial court sustaining defendant's demurrer and dismissing the complaint, the plaintiffs now appeal.

Effective May 21, 1954, Mountain States Power Company was merged into and became a part of Pacific Power & Light Company, and thereafter its legal existence terminated. Based upon a stipulation of the parties this court on November 12, 1954, ordered that Pacific Power & Light Company be substituted as the party defendant herein. However, in order to avoid confusion we shall continue to refer to Mountain States Power Company as such rather than Pacific Power & Light Company wherever reference to such company appears.

At the time of the oral argument on the demurrer, the defendant requested the lower court to take judicial notice of certain records of the Public Utilities Commission. It is now agreed by the parties that these documents shall be considered as a part of the record. These records reveal that on September 5, 1951, defendant filed with the Public Utilities Commissioner (hereinafter referred to as Commissioner) an application

for authority to apply temporary and flexible rate surcharges to substantially all of its schedules. The application pointed out that current consideration indicated that adverse water conditions in the northwest would necessitate the purchase of an abnormally large quantity of steam-generated electric energy at a substantially higher cost than the hydro-generated energy available under normal conditions to maintain normal operations. The defendant company proposed that a surcharge be applied to bills each month to recover the estimated amount of such excess steam costs beginning with the October billings, to be adjusted from month to month thereafter as soon as the actual excess cost for such month became known. This schedule and application were suspended and a hearing was set for September 17, 1951, which resulted in the following PUC Oregon Order No. 28235 issued October 2, 1951:

## "BEFORE THE PUBLIC UTILITIES COMMISSION OF OREGON

"In the Matter of the Suspension of)
Emergency Rate Surcharge filed by)
Mountain States Power Company.)      U-F-1618
(On the Commissioner's own motion.))

"The above entitled matter came on for hearing, pursuant to notice, * * *.

* * * * *

"Whereupon evidence was introduced, the hearing concluded, and the matter submitted for determination. Based on the record, evidence, and law in the matter, the Commission makes and enters the following findings, conclusions, and order, to-wit:

## "FINDINGS

"That Mountain States Power Company is a member of the Northwest Power Pool, which has as its prime purpose the maximum utilization of all

electrical generating facilities by the interconnection of all the major plants in the Pacific Northwest, including federal, municipal, and private utility plants; that the now existing and anticipated reduction in stream flow makes it necessary to operate, for the benefit of the Pool, the available steam generating facilities of the Pool members on an 'around-the-clock' basis in order to alleviate the shortage created by the dry period. That the normal use of steam plant energy is for peaking and stand-by reserve purposes as the cost of steam plant energy is much greater than the cost of hydro energy.

"That, in order to cover the estimated excess costs of steam energy during the periods of acute hydro-power shortage, Mountain States Power Company, on September 5, 1951, filed an Emergency Rate Surcharge to become effective on less than statutory notice.

"That the surcharge, as filed, would be applied on a percentage increase basis to practically all electric bills sent out by the Company, without changing the present basis rate schedules, beginning with the October 1951 billing cycle period, with the amount of the surcharge to be on an estimated basis as determined by the Company; that, when the actual excess costs were known, the percentage would be adjusted so that at the end of the period, the Company would recoup the excess energy costs actually experienced.

"That the filing proposes that the percentage surcharge would apply uniformly to practically all customers of the Company in the Willamette Valley District and the North Lincoln District, with the exception of that area served in competition with the City of Springfield, Lane County, Oregon.

"That, in compliance with Sections 112-4,134 and 112-4,135, OCLA, the Emergency Rate Surcharge as filed by the Mountain States Power Company was suspended for a period not to exceed ninety days from September 6, 1951, and a hearing set for

September 17, 1951, by PUC Oregon Order No. 28027.

"That it is possible to determine on an actual basis the percentage increase to be applied, and that the surcharge should be applied on the basis of actual experience of the Company or on the known obligations committed by the Company in lieu of permitting it to be applied on the basis of an estimate as set out in the proposed filing.

"That the surcharge payments by the customers on an over-all basis should not exceed actual excess costs of electrical energy as the result of inadequate water supply, and that only those excess costs brought about by the operations of the steam plants will be considered and only in the event that the Company's earning position cannot absorb the charges placed upon it by such operation.

"That the surcharge should apply to all customers of the Mountain States Power Company in its Willamette Valley District and North Lincoln County District, with the exception of service for city street lighting and for that area served in competition with the City of Springfield, Lane County, Oregon.

"That the conditions now facing the utilities, brought about by the deficiency in the water supply, will be temporary, and the surcharge as applied must be considered from the standpoint of meeting the emergency that now confronts the members of the Power Pool.

"That, in order to show the actual results of operation for the year 1951, the Company should defer the closing of its books for the year 1951 to permit the inclusion in the accounts of the surcharge collected in 1952 covering the excess costs incurred in 1951.

## "CONCLUSIONS

"1. That the filing of the Mountain States Power Company as submitted on September 5, 1951, should be denied.

"2. That the Company should immediately file a tariff providing a surcharge to cover excess costs of electric energy required to be paid by the Company to the Power Pool as the result of operations of steam plant to meet the deficiencies of the Power Pool or to cover the costs of obligations actually incurred to meet those deficiencies, with such tariff filing to be a temporary rate filing to cover the emergency deficiency period only.

"3. That such filing should become effective as to the percentage of surcharge and as to the date of application by directive of the Commissioner, which directive will be submitted to the Company after careful investigation of the Company's records and operations, and the Mountain States Power Company should not be permitted to recoup, through application of the surcharge, an amount in excess of a reasonable rate of return on its rate base.

"4. That the surcharge by directive should apply to all customers, both contract and general schedule customers, of the Mountain States Power Company in its Willamette Valley District and North Lincoln County District, with the exception of service for city street lighting and for that area served in competition with the City of Springfield, Lane County, Oregon.

"5. That Mountain States Power Company should be permitted to continue to meet competitive rates within the Springfield area providing that normal surcharge that would have been applied to the customers' billings within the competitive area shall not, in any way, be absorbed by the remaining customers of the Mountain States Power Company, and that the loss sustained by the failure to collect the surcharge from the customers in the competitive area shall be borne by the Company's stockholders.

"6. That Mountain States Power Company should make appropriate book entries to reflect proper 1951 operations in the event all of the 1951

excess costs have not been recouped by surcharges prior to January 1, 1952."

In accordance with the above order, the defendant on October 5, 1951, filed with the Commissioner its First Revised Sheet No. 16 of its Tariff PUC Oregon 22:

## "TEMPORARY SURCHARGES COVERING ABNORMAL STEAM POWER GENERATION COSTS

"Bills for service furnished in the State of Oregon under the rate schedules of this tariff (excepting street lighting service and service furnished within the area in and adjacent to Springfield, Oregon, where the Company is in direct competition with the City of Springfield, Lane County, Oregon) shall be increased from time to time by surcharges to cover excess costs which it is necessary for the Company to incur because of the use of steam generated energy in excess of that required for normal peaking and standby purposes. The amounts and time of application of such surcharges shall be determined in accordance with the provisions of Order No. 28235 issued by the Public Utilities Commissioner of Oregon on October 2, 1951."

Defendant also filed Original Sheet No. 16 of its Tariff PUC Oregon 23, which was almost identical.

Because water conditions improved during the fall of 1951, no surcharge was imposed during the winter water storage season of 1951-1952, and nothing further occurred with respect to the proposed surcharge until more than a year later. Due to the lack of rainfall and precipitation beginning in June, 1952, the situation again became critical, and on November 20, 1952, the defendant sent the following letter to the Commissioner:

"Dear Mr. Heltzel:

"Please refer to your Order No. 28235, dated October 2, 1951, which established a procedure

whereby Mountain States Power Company may collect temporary surcharges from its customers for the purpose of recovering excess power costs incurred because of having to use abnormally large amounts of steam-generated energy to maintain service to customers during periods of adverse water conditions.

"Stream flow conditions in the Northwest during the months of September and October, 1952, and thus far in November have approximated those of the worst water-year of record (1936-37) and have made necessary abnormal and extremely heavy use of steam-generated energy by Mountain States Power Company, as well as by other members of the Northwest Intercompany Power Pool, and, as was contemplated by your Order No. 28235, we hereby notify you of this fact and of the amount of excess costs which have been incurred by this company as a result thereof.

"Mountain States' share of the excess costs over and above the cost of normal power requirements billed to members of the Intercompany Pool at the monthly base rate of 75 cents per kilowatt of peak deficiency plus $1\frac{1}{2}$ mills per kilowatt-hour of energy deficiency, was $46,839.95 in September 1952 and $227,455.66 in October 1952. Excess costs similar to those incurred in October are expected to be incurred in November and, if critical water conditions prevail through the coming winter, the total excess costs to be incurred by Mountain States through April 1953 are estimated to be approximately $1,550,000.

"The Company will absorb the portion of excess costs allocable to street lighting service and to service within the Springfield competitive area, as contemplated by your Order No. 28235, but hereby respectfully requests the issuance of a directive authorizing the application of a surcharge to recover the remaining excess costs.

"An extremely heavy surcharge applied to December billings would be required to recover in one month the excess costs thus far incurred and a

similar heavy surcharge to recover continuing excess costs month by month. It does not seem practicable, in the interest of the Company or its customers, to collect surcharges of the magnitude involved on such a basis and we, therefore, suggest that the requested directive authorize the application of a 20 percent monthly surcharge only on billings during the December billing cycle and during subsequent billing cycles until such time as the Company shall have recovered the excess costs (adjusted to exclude non-recoverable excess costs in accordance with the above mentioned order) actually incurred by it during the period beginning with September 1952.

"Power was scheduled from the Intercompany Pool for the delivery to our Willamette Valley district only in September 1952 and to our Willamette Valley, Coos Bay, and North Lincoln County districts in October and November and will continue to be so scheduled for the foreseeable future. It is proposed, therefore, to apply surcharges on billings in those three districts to the end that excess costs applicable to the respective districts may be recovered within each of such districts.

"We attach exhibits consisting of 4 pages showing the actual and estimated excess costs for the period September 1952 through April 1953; the distribution of such excess costs by districts; the amount of such excess costs recoverable by districts; the revenues subject to surcharges by districts; and the effect of such surcharge on the recovery of excess costs during the period December 1952 through October 1953, assuming critical water conditions continue.

"We further respectfully request that your office review our records on excess costs, our methods of distributing these costs to districts, and other matters that are pertinent to enable you to verify the fact that our surcharge is based on excess costs actually incurred and that such surcharge is not continued beyond the date necessary to effect recovery of the portion of such excess costs as is considered recoverable."

On November 24, 1952, the Commissioner replied to defendant's letter with the following:

"Dear Mr. Trimble:

"This will acknowledge your letter of November 20, 1952 requesting authority to apply tariff provisions in your schedules to recover, through surcharges, the abnormal steam costs for electrical energy. These abnormal costs have been brought about by the reduction in the stream flow conditions in the Pacific Northwest area.

"In approving your surcharge of 20% to apply to your December billings and to continue thereafter until the abnormal costs have been recovered, it is our intention to make a continuing check of the charges made to the Mountain States Power Company for energy from the Pool operations. In addition we intend to determine all factors pertaining to the normal cost of energy for your company, and the surcharge as approved will not be permitted to apply to your customers' billings beyond the point of recovering excess charges as they apply to the Mountain States Power Company.

"We are also requiring in this letter that your company submit monthly reports setting forth the total revenue derived from the application of the surcharge and the amounts of excess costs billed to your company by the Intercompany Pool."

In carrying out this plan, defendant assessed a surcharge to the bills of its consumers affected by this suit through April, 1953. The Commissioner made a continuing check of the charges made for excess steam costs and adjusted the surcharges so that the amount recovered would not exceed recovery of such excess costs. Finally, in a letter dated April 24, 1953, the Commissioner terminated all surcharges:

"Dear Mr. Trimble:

"A detailed check and a thorough investigation of excess costs that are properly applicable to the

Willamette Division of the Mountain States Power Company has been made by my staff members. Their report shows that by the first of May, 1953, all excess charges will have been recovered from your customers in the Willamette Division with the exception of an approximate amount of $17,000.00. You, of course, are well aware that final adjustments in the billings from sources of energy during the last months of the critical period have not as yet been received.

"It is believed the company should be deprived from collecting the additional $17,000.00 to insure that the customers are not overbilled in the event of adjustments that might accrue to the benefit of the Mountain States Power Company.

"We are, therefore, directing you to cease and desist from collecting any further surcharges from your customers in the Willamette Division of the Mountain States Power Company.

"This will eliminate all the surcharges from the Mountain States Power Company's system in the State of Oregon."

On March 31, 1953, Monroe and Lillie M. Sweetland, as users of electric energy, filed a complaint, individually and "on behalf of other consumers of electric energy in the State of Oregon," against Mountain States Power Company, Portland General Electric Co., and Pacific Power & Light Company before the Public Utilities Commissioner. This complaint charges that: (1) excess earnings acquired by the utilities during exceptionally good water years should be used to offset excessive costs in poor water years, rather than the use of a surcharge; (2) management decisions were responsible for inability of utilities to furnish adequate hydro-generated electricty, so stockholders should bear the loss; (3) if consumers are required to underwrite losses incurred by reason of water shortages, a rate of return of 6 per cent was unreasonable and should be reduced to

4 per cent in order to reflect such reduced risk; (4) the surcharge was unfair and discriminatory since a far greater proportion of excess steam costs must be paid by the smallest consumers of electrical energy; (5) the surcharge was unfair and discriminatory to consumers who used little or no electrical energy during period when excessive steam costs were incurred; (6) no lawful schedule had been filed by defendants specifying the amount, duration or mode of application of said surcharge; the only tariffs filed were in violation of §§ 112-429 to 112-431, OCLA (now ORS 757.220, 757.240 and 757.225); and that defendants were charging greater amounts than were specified in their regular lawful schedules on file with the Commissioner; (7) the rates of the utilities were excessive and unreasonable for various specified reasons. Complainants' prayer for relief asked that the collection of any surcharges be terminated, that all consumers be credited for all surcharges paid by each, that defendants cease all unfair, unjust, and discriminatory practices, and that the rates, schedules, and tariffs of defendants be re-examined by the Commissioner who should enter such further orders as should be necessary and proper to protect the consumers of the state of Oregon.

The complaint in the suit before us alleges that the collection by the defendant of approximately $565,000 under the surcharge was unlawful and in violation of § 112-431, OCLA, (now ORS 757.225). The prayer for relief asks the court for a decree (1) temporarily and permanently enjoining the defendant from collecting any further sums as a surcharge; and (2) requiring the defendant to report to the court the amount of all sums collected under the surcharge, and directing the manner in which said sums shall be refunded or credited to plaintiffs and all others

similarly situated, or requiring the defendant to pay into court all sums collected under the surcharge and directing the manner in which it shall be returned to plaintiffs and others similarly situated; and further for the allowance of a reasonable attorneys' fee in accordance with § 112-467, OCLA, (now ORS 757.335).

The defendant's demurrer is based on the following grounds: (1) that the court is without jurisdiction of the subject of the suit; (2) that there is another proceeding pending involving the same subject matter and the same demand for relief; (3) that there is a defect of parties in that the Public Utilities Commissioner of Oregon is a necessary and indispensable party defendant; (4) that plaintiffs' complaint does not state facts sufficient to constitute a cause of suit; and (5) that plaintiffs' suit is not commenced within the time provided by law.

On November 18, 1953, the Commissioner entered an order dismissing the complaints pending before him against the utility companies, and on December 30, 1953, the trial court sustained the defendant's demurrer and ordered the complaint dismissed.

The question of jurisdiction of the courts, and of the public service commissioner was considered by this court in *O.-W. R. & N. Co. v. McColloch*, 153 Or 32, 55 P2d 1133. In that case a group of shippers, upon filing a complaint with the public service commission, secured an order from the commissioner requiring the defendant carriers to pay reparations to the shippers upon four classes of claims in which the commissioner found that the charges had been unjust, unreasonable, and unlawful. In a suit instituted by the carriers, the court was asked to set aside this order of the commissioner and to enjoin the defendant shippers from prosecuting actions to recover the

reparation awards contained in the order. From an order sustaining defendants' demurrer and dismissing the suit, plaintiffs appealed. We held that the Commissioner was without authority to entertain a complaint alleging that the charges collected were in excess of those based on published tariffs. On page 45 we said:

"According to the provisions of § 62-126, *supra,* it is only 'after hearing on a complaint made as provided in § 62-125' that the commissioner has authority to 'make an order directing the carrier to pay to the complainant . . . the sum found to have been imposed upon or collected from him in violation of' § 62-103 or § 62-111.

"Section 62-125, *supra,* provides in part as follows:

'Upon complaint of any person . . . that any of the rates, fares, charges or classifications, or any joint rate or rates are in any respect unreasonable or unjustly discriminatory, or that any regulation or practice whatsoever affecting the transportation of persons or property, or any service in connection therewith, are in any respect unreasonable or unjustly discriminatory or that any service is inadequate, the commission may notify the railroad complained of that complaint has been made, and ten days after such notice has been given the commission may proceed to investigate the same as hereinafter provided. * * * If upon such investigation the rate or rates, fares, charges or classifications, or any joint rate or rates, or any regulation, practice or service complained of shall be found to be unreasonable or unjustly discriminatory, or the service shall be found to be inadequate, the commission shall have power to fix and order substituted therefor such rate, or rates, fares, charges or classification as it shall have determined to be just and reasonable

and which shall be charged, imposed and followed in the future, and shall also have the power to make such order respecting such regulations, practice or service as it shall have determined to be reasonable, and which shall be observed, followed, used and supplied in the future.'

"The above section authorizes the filing of a complaint with the commissioner when the unreasonableness of rates, fares, charges or classifications is made an issue, and the procedure to be followed in case such a complaint is filed is outlined. Nowhere in the section is there any language expressly authorizing a complaint to be filed with the commissioner to the effect that charges made are in excess of those based on published tariffs or in excess of the maximum rates theretofore prescribed by the commissioner. If the only complaint which the shipper had was that he had been overcharged, there would be no issue before the commissioner as to the reasonableness of rates, and no necessity of determining just and reasonable rates to be charged in the future.

\* \* \* \* \*

"It is therefore apparent, when we construe § 62-126 in connection with the other sections therein referred to, that the legislature had in mind, in enacting that section, to confer upon the public utilities commissioner authority when investigating rates to award reparation in those instances in which he should find that shippers had been damaged by the application of unjust and unreasonable rates."

After quoting from *Great Northern Railway v. Merchants' Elevator Company,* 259 US 285, 291, 42 S Ct 477, 66 L ed 943, on page 48 we said:

"It is obvious from the foregoing excerpt that the court distinguishes between an unreasonable

rate and an overcharge. In one sense an overcharge is the result of an unreasonable rate, but as used in § 62-125 the word 'unreasonable' does not have reference to charges based on rates in excess of those established.

\* \* \* \* \*

"There is no necessity of resorting first to the commission in those instances in which the only question involved is an overcharge, i.e., a charge in excess of that called for by established rates, whether such rates have been fixed by determination of the commissioner or by the filing of a published tariff."

We determined, p 52, that the Oregon law relating to reparation did not cover overcharges:

"The language of § 62-126, conferring authority upon the public utilities commissioner to order reparation and to determine the amount thereof, is limited to those instances in which some administrative function or discretion is involved, and does not include cases in which the court has jurisdiction without prior finding or order by the commissioner as to the reasonableness of any rate, rule or regulation. The commissioner's jurisdiction is limited. His authority must affirmatively appear from the law creating his office and defining his powers: Northern Pacific Railway v. Public Service Commission, 47 F2d 778."

Turning to the statutes dealing with utilities, § 112, Chapters 1-4, OCLA (now ORS title 57, ch 757), we find that the Commissioner has no authority to award any reparations, either for unreasonable or unjustly discriminatory rates, or for overcharges, and that the Commissioner is granted jurisdiction to hear complaints based only on allegations that rates are unreasonable or unjustly discriminatory.

Section 112-441, OCLA, (now ORS 757.505) describes the complaints that can be heard by the Commissioner:

"Upon a complaint made against any public utility by any mercantile, agricultural or manufacturing society or by any body politic or municipal organization or by any three persons, firms, corporations, or associations, that any or all of the rates, tolls, charges or schedules or any joint rate or rates are in any respect *unreasonable or unjustly discriminatory,* or that any regulation, measurement, practice or act whatsoever affecting or relating to the production, transmission, delivery or furnishing of heat, light or water or power or the conveyance of any telegraph or telephone message, or the transportation of persons or property by street railroad, or any service in connection therewith is in any respect *unreasonable, insufficient or unjustly discriminatory,* or that any service rendered by any public utility is inadequate or is not afforded, the commission (commissioner) shall proceed with or without notice, to make such investigation as it may deem necessary or convenient. But no order affecting said rates, tolls, charges, schedules, regulations, measurements, practice or act complained of shall be entered by the commission (commissioner) without a formal hearing." (Italics added)

Section 112-442, OCLA, (now ORS 757.510) makes provision for notification of the parties, place of hearing, rights of process, etc., and then § 112-443, OCLA, (now ORS 757.530) provides:

"If, upon such investigation, any rates, tolls, charges, schedules, or joint rates shall be found to be unjust, unreasonable, insufficient or unjustly discriminatory or to be preferential *or otherwise in violation of any of the provisions of this act,* the commission (commissioner) shall have power to fix

and order substituted therefor such rate or rates, tolls, charges, or schedules as shall be just and reasonable. If upon such investigation, it shall be found that any regulation, measurement, practice, act or service complained of is unjust, unreasonable, insufficient, preferential, unjustly discriminatory or *otherwise in violation of any of the provisions of this act,* or if it be found that any service is unsafe or inadequate or that any reasonable service cannot be obtained or is not afforded, the commission (commissioner) shall have power to substitute therefor such other regulations, measurements, practices, service or acts and to make such order respecting, and such changes in such regulations, measurements, practices, service or acts as shall be just and reasonable." (Italics added)

While it cannot be denied that charges in excess of those lawfully established are in violation of the provisions of this act, § 112-431, OCLA, (now ORS 757.225) it cannot be contended that this provision enlarges the jurisdiction of the Commissioner to hear complaints alleging mere overcharges, for the words "upon such investigation" limit the effect of this act to only such complaints as may be filed under § 112-441, OCLA, (now ORS 757.505); that is, those alleging rates to be "unreasonable or unjustly discriminatory." It may be argued that § 112-4,114, OCLA, (now ORS 756.520) under Article 3, Uniform Practice Act of Public Utilities Commissioner, grants jurisdiction to the Commissioner to entertain complaints alleging overcharges by public utilities. This act provides, in part:

"Any person may file a complaint before the commissioner, or the commissioner may, on his own initiative, file such complaint. Such complaint shall be against such person whose business or activities are regulated by some one or more of the acts,

> jurisdiction for the enforcement or regulation whereof is conferred upon the commissioner. * * * It shall not be necessary that a complainant shall have a pecuniary interest in the matter complained of, but the commissioner shall not grant any order of reparation to any person not a party to the proceedings in which such reparation order is made. * * * The complaint shall state all grounds of complaint on which the complainant may seek relief or the violation of any law claimed to have been committed by the defendant, and the prayer of the complaint shall pray for the relief which the complainant shall claim he is entitled to. * * *''

This section not only mentions reparations, but also requires the complaint to state the violation of any law claimed to have been committed by the defendant.

The preamble to this act, Oregon Laws 1939, ch 320, p. 602, states:

> ''To provide a uniform method of proceeding and hearing before the public utilities commissioner for the enforcement of any act, the administration of which is by said act conferred upon the public utilities commissioner; * * *.''

This act, however, is only a uniform practice act which defines the rules for all proceedings over which jurisdiction has been conferred upon the commissioner in respect to the various businesses within his jurisdiction. The railroad statutes confer jurisdiction upon the commissioner to award reparation. No such provision is found in the public utility statutes. To determine the jurisdiction of the commissioner over a particular business, one must refer to the substantive statutes governing that business.

In respect to power companies, we find that the statutes declare every unjust or unreasonable charge (§ 112-407, OCLA, now ORS 757.020), every unjustly

discriminatory charge (§ 112-463, OCLA, now ORS 757.310), and every charge in excess of the lawfully filed schedule of rates (§ 112-431, OCLA, now ORS 757.225) to be unlawful. Section 112-467, OCLA, now ORS 757.335, grants to a patron of a public utility, guilty of doing any act declared to be unlawful, a cause of action before a court for treble damages.

■■ The case of *O.-W. R. & N. v. McColloch,* supra, has determined the law of this jurisdiction. A patron must first submit the question of the lawfulness of rates alleged to be unreasonable or unjustly discriminatory to the Commissioner, by a complaint filed under authority of § 112-441, OCLA, now ORS 757.505, before availing himself of his rights under § 112-467, OCLA, now ORS 757.335. But where the only allegation of the patron is that the charges were in excess of the lawfully filed schedule of rates (§ 112-431, OCLA, now ORS 757.225), the patron must seek redress by proceeding directly in the courts for the relief provided in § 112-467, OCLA, now ORS 757.335, or in an action for money had and received. *Service Lumber Co. v. Sumpter Valley Railway Co.,* 67 Or 63, 135 P 539. See, also, *Lee, Inc. v. Pac. Tel. & Tel. Co.,* 154 Or 272, 59 P2d 683, and *Railway Exch. Bldg. v. Light & Development Co.,* 341 Mo 334, 107 SW 2d 59.

■ At the time of the commencement of this action, the billing and collecting of a surcharge had ceased, and, therefore, the case at bar is an action for money had and received, arising from the collection of charges in excess of the lawfully established rates. The only question, therefore, is one of law; that is, whether the schedules filed by the defendant purporting to authorize the surcharge were filed in accordance with

the prescribed statutory procedure, and are, therefore, lawfully established rates. We may not consider the unreasonableness or unjust discrimination of rates, since this demands the exercise of a quasi-legislative or administrative function of the Commissioner.

While we have examined each issue raised and argued by counsel, it will be necessary, for the determination of this case, to set out only our findings on the question of whether plaintiffs' complaint states facts sufficient to constitute a cause of suit.

The plaintiffs argue that the surcharge collected was unlawful for the following reasons: (1) it was unjustly discriminatory in that it was not applied in the Springfield area; (2) it was not lawfully established either as a permanent rate change under § 112-429, OCLA, now ORS 757.220, or as an emergency rate change under § 112-471, OCLA, now ORS 757.235.

As we have stated, the issue of unjust discrimination cannot be raised under this complaint. The problem before this court is well-stated in appellants' opening brief:

"If this large sum of money was collected in accordance with statutory authority, plaintiffs' complaint does not state a cause of action. On the other hand, if the imposition of the surcharge was not legally authorized or if it was in excess of defendant's lawful schedule of rates, then the complaint does state a cause of action   *   *   *."

The order of the Commissioner entered October 2, 1951, and the tariffs filed by the defendant on October 5, 1951, cannot be used to justify the surcharge collected in December, 1952, and the spring of 1953. They were limited to the duration of the emergency

then confronting the defendant by the language of the October 2nd order:

"That the Company should immediately file a tariff providing a surcharge to cover excess costs of electric energy required to be paid by the Company to the Power Pool as the result of operations of steam plant to meet the deficiencies of the Power Pool or to cover the costs of obligations actually incurred to meet those deficiencies, *with such tariff filing to be a temporary rate filing to cover the emergency deficiency period only.*" (Italics added)

Both parties admit in their briefs that water conditions improved soon after these tariffs were filed and that no surcharge was required at that time. When the water conditions improved the "emergency deficiency period" terminated, along with the effectiveness of these tariffs. The lawfulness of the surcharge as an established rate, therefore, must depend upon defendant's letter of November 20, 1952, and the Commissioner's letter of November 24, 1952.

The plaintiffs attack the lawfulness of the surcharge, because, they say, (1) the documents filed included only a statement of a *method* of arriving at the rates and do not specify the actual rate to be charged, and (2) that neither tariffs nor orders of the Commissioner may be filed or issued in letter form.

While the first attack might be worthy of consideration when directed at defendant's tariff of October 5, 1951, it lacks merit when directed at the letters of defendant and the Commissioner written on November 20 and 24, 1952. The term "rate" is defined in 43 Am Jur 624, Public Utilities and Services § 82, as follows:

"A 'rate' for a public utility service may be defined as the price stated or fixed for some com-

modity or service of general need or utility supplied to the public, measured by a specified unit or standard.''

Both the defendant's letter and the Commissioner's letter specified the exact amount of the surcharge to be collected.

■■ Plaintiffs' contention that neither tariffs nor orders may be filed or issued in letter form is also without merit. The reason for requiring schedules of rates to be filed with the Commissioner is treated in Re Portland Gas Light Company, 69 PUR NS 154, 157:

"It is apparent to us that one end which the legislature sought to accomplish by this explicit language, was to place upon the public record, the facts necessary to enable the customer to determine how much money he is required to pay for a given service.''

Our statutes do not prescribe the form in which schedules of rates or orders shall be filed. In fact, § 112-432, OCLA (now ORS 757.230), provides:

"The commission (commissioner) may prescribe such changes in the form in which the schedules are issued by any public utility as may be found to be expedient.''

Plaintiffs argue that there is no evidence to show the Commissioner ever prescribed a change in the form of schedules. We feel that the act of the Commissioner in accepting defendant's November 20, 1952, letter, coupled with his statutory authority to permit changes in the form of schedules, was sufficient to establish the letter as a valid supplement to defendant's schedule of rates.

The importance of the formality of documents of this type was treated in *C. & E. R. Co. v. Berwind-White Coal Min. Co.*, 171 Ill App 302 (affirmed in

*Berwind-White C.M. Co. v. Chicago & E. R. Co.,* 235 US 371, 35 S Ct 131, 59 L ed 275). A railroad company recovered a judgment for demurrage charges against a shipper; the railroad had filed with the Commissioner a book of rules of the Chicago Car Service Association relating to liability for demurrage, and, a few days later, sent a letter to the Commissioner advising him that the charge would be $1.00 per day. The Illinois court held:

"* * * These documents, as the record shows, are all printed in plain, legible type, and the rules and regulations therein contained are clearly set forth and can be easily and readily understood, and are such that any one desiring to find out from the documents that are on file with the Commission what the demurrage charges in the territory of the Chicago Car Service Association were, could readily have done so.

"Counsel for appellant make numerous criticisms of the publications. Their first criticism is as to the style and form of the documents themselves. Those, however, are matters entirely for the Commerce Commission to determine. It was not for the trial court, and is not for this court to determine or fix the particular form or style of tariffs, or the size of the type in which the tariffs are to be printed. The provision of the act touching this point is:

"The Commission may determine and direct the form in which the schedules required by this section to be kept open to public inspection shall be prepared and arranged, and may change the form from time to time, as shall be found expedient.' "

In affirming the judgment, the United States Supreme Court held at page 132:

"* * * The argument is that such documents were not sufficiently formal to comply with the

law, and hence afforded no ground for allowing demurrage. But the contention is without merit. The documents were received and placed on file by the Commissioner without any objection whatever as to their form, and it is certain that, as a matter of fact, they were adequate to give notice.''

In the case before us, copies of both letters were on file with the Commissioner. Any consumer of defendant's electric energy, upon inquiring at the Commissioner's office after November 24, 1952, could discover the exact amount required to be paid for electrical energy from the documents on file.

Section 112-474, OCLA, now ORS 757.025, provides:

''A substantial compliance with the requirements of this act shall be sufficient to give effect to all the rules, orders, acts, and regulations of the commission (commissioner) and they shall not be declared inoperative, illegal or void for any omission of a technical nature in request thereto. The provisions of this act shall be liberally construed with a view to the public welfare, efficient facilities and substantial justice between patrons and public utilities.''

Since the two letters provide for adequate notice to the consumers, and thereby fulfill the purpose intended by the statutory requirements, we feel that ''substantial justice between patrons and public utilities'' may be done only by holding that the letters fulfilled the requirements of a valid schedule and order.

Next, we must consider whether the procedure employed by the defendant and the Commissioner to change defendant's rates so as to permit collection of the surcharge was authorized by statute.

Provisions for emergency rate changes are found in § 112-471, OCLA, now ORS 757.235:

"The commission (commissioner) shall have power, when deemed by it necessary to prevent injury to the business or interests of the people or any public utility of this state in case of any emergency to be judged of by the commission (commissioner), to temporarily alter, amend, or with the consent of the public utility concerned, suspend any existing rates, schedules and order relating to or affecting any public utility or part of any public utility in this state. Such rates so made by the commission (commissioner) shall apply to one or more of the public utilities in this state or to any portion thereof as may be directed by the commission (commissioner), and shall take effect at such time and remain in force for such length of time as may be prescribed by the commission (commissioner)."

Plaintiffs contend that this section requires the Commissioner to hold a hearing and investigation before making any emergency rate changes, and that any such changes ordered by the Commissioner without a hearing are invalid.

We do not feel that the legislature so intended to restrict the Commissioner's emergency powers. This is not an appeal from the Commissioner's order declaring an emergency and establishing emergency rates. If it was, the question of whether a hearing was held might be important in considering whether there was sufficient evidence before the Commissioner to enable him to find that an emergency existed, or whether the Commissioner had abused his discretion. The only question, therefore, is whether or not the legislature intended to permit the Commissioner to find summarily that an emergency existed.

In *City of La Crosse v. Railroad Commission,* 172 Wis 233, 236, 178 NW 867, 869, the Wisconsin court treated a statute similar to § 112-471, OCLA, now ORS 757.235, saying:

"It is manifest that these provisions confer powers on the commission different from those granted it to order permanent reasonable rates for adequate service rendered the public by a utility. The language of this statute is that these powers shall be exerted by the commission 'when deemed by it necessary to prevent injury to the business or interest of the people  *  *  *  in case of an emergency to be judged of by the commission,' and that any such rates made by the commission 'shall take effect at such time and remain in force for such length of time as may be prescribed by the commission.' Manifestly the commission is authorized to act within these powers to protect the people or any utility business of this state. The statute calls for summary action by the commission to meet the unusual conditions of such business created by unforeseen and unexpected culmination of circumstances which threaten to injure the utility business or the interest of the public connected therewith. The provisions do not require that the commission in determining whether or not such an emergency exists shall undertake such an inquest as is required of it in order to establish permanent reasonable rates and adequate service of utilities. It is manifest that the commission is given powers to act upon its own motion in a summary manner, when it deems it necessary to protect the utility business or the interest of the people when they are threatened by emergency conditions in the nature contemplated by the statutes."

An indication of the intent of the legislature, as expressed in § 112-471, OCLA, now ORS 757.235, may be gained by a consideration of the 1953 amendment

to this section, ORS 757.235. The new statute adds to the former provision the following:

"If any existing rate of any public utility or division or department of any public utility in this state is adjusted under the provisions of this section, it shall become effective 30 days thereafter unless, within that time, the commissioner, either on his own initiative or at the written request of any interested party, announces a hearing to determine the propriety and reasonableness of such rate.  *   *   * "

■ It seems clear that the legislature by this amendment recognized that § 112-471, OCLA, now ORS 757.235, did not require the Commissioner to hold a hearing before ordering an emergency rate adjustment. The amendment was designed to increase the protection of the consumer public and to restrict the power of the Commissioner.

We conclude that the charges collected by defendant under the surcharge, as ordered by the Commissioner, were established as lawful rates under § 112-471, OCLA, now ORS 757.235.

Plaintiffs' complaint fails to state facts sufficient to constitute a cause of suit; therefore, the order of the trial court sustaining defendant's demurrer and dismissing the complaint is affirmed.

Neither party shall recover costs in this court.

Mr. Justice LATOURETTE did not participate in this opinion.