Argued and submitted February 3, 2012, affirmed February 6, 2013

Frank GEARHART;
Patricia Morgan;
Kafoury Brothers, Inc.;
and Utility Reform Project,
*Petitioners*,

*v.*

PUBLIC UTILITY COMMISSION OF OREGON
and Portland General Electric Company,
*Respondents*.

Frank GEARHART;
Patricia Morgan;
Kafoury Brothers, Inc.;
and Utility Reform Project,
*Petitioners*,

*v.*

PUBLIC UTILITY COMMISSION OF OREGON
and Portland General Electric Company,
*Respondents*.

Public Utility Commission of Oregon
08487, 09093; A140317

299 P3d 533

Linda K. Williams argued the cause and filed the briefs for petitioners Frank Gearhart, Patricia Morgan, and Kafoury Brothers, Inc.

Daniel W. Meek argued the cause and filed the briefs for petitioner Utility Reform Project.

James N. Westwood argued the cause for respondent Portland General Electric Company. With him on the brief were Dina M. Dubson and Stoel Rives LLP.

Denise G. Fjordbeck, Attorney-in-Charge, Civil/Administrative Appeals, argued the cause for respondent Public Utility Commission of Oregon. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Raymond W. Myers filed the brief *amicus curiae* for Citizens' Utility Board of Oregon.

Lisa Rackner filed the brief *amicus curiae* for Avista Corporation, Idaho Power Company, Northwest Natural Gas Company, and PacifiCorp.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

Schuman, P. J., dissenting.

**NAKAMOTO, J.**

As a result of one Supreme Court opinion, *Dreyer v. PGE*, 341 Or 262, 278-79, 142 P3d 1010 (2006), and two Court of Appeals opinions, *Citizens' Utility Board v. PUC*, 154 Or App 702, 962 P2d 744 (1998), *rev dismissed*, 335 Or 91 (2002) (*Trojan I*), and *Utility Reform Project v. PUC*, 215 Or App 360, 170 P3d 1074 (2007) (*Trojan II*), the Oregon Public Utilities Commission (the PUC) was directed to reconsider the rates that the PUC had approved and that intervenor Portland General Electric (PGE) had charged customers for the sale of electricity and related services for two separate periods, from April 1995 through September 2000, and after October 1, 2000. Petitioners Gearhart *et al.* (class action plaintiffs or CAPs) and Utility Reform Project (URP) seek judicial review of PUC Order No. 08-487, the PUC's order on remand.[1] *See* ORS 756.610(1) (allowing judicial review of the PUC's orders in contested cases under the provisions of ORS 183.480 to 183.497). They assert that the PUC misunderstood the scope of its reconsideration on remand and, as a result, failed to apply the correct legal standards in its reevaluation. We review the PUC's order to determine whether the PUC correctly applied the applicable law, whether there is substantial evidence to support its findings, and whether it acted within the scope of its discretion, ORS 183.482(8), and affirm.

## I.   UTILITY RATEMAKING

We begin with a brief overview of utility ratemaking, which is at the heart of this dispute. The following basic principles concerning the PUC and ratemaking provide needed context for an understanding of the history of this dispute, and, as we later discuss, they, in part, ground our holding in this case.

Because public utilities are natural monopolies, the rates that they charge for their services are regulated. The PUC is the state agency charged with establishing "fair and reasonable" rates for the provision of services by public utilities in Oregon. ORS 756.040. Ratemaking involves the

---

[1] PUC Order No. 09-093, also referenced in the caption, is an order rejecting PGE's motion to modify certain details concerning the refund mechanism. There are no assignments of error related to that order.

PUC's exercise of considerable discretion to balance the interests of utility investors and customers and the public in general, ORS 756.040(1), and the power to prescribe prospective rates is considered a legislative function. *Valley & Siletz R. R. Co. v. Flagg*, 195 Or 683, 715, 247 P2d 639 (1952).

The PUC has broad discretion in its legislative function of setting rates, subject only to statutory and constitutional constraints. *American Can v. Lobdell*, 55 Or App 451, 462-63, 638 P2d 1152, *rev den*, 293 Or 190 (1982). Rates are prohibited and unlawful in three circumstances: (1) the rates are unjust and unreasonable, *id.*; *see also* ORS 756.040(1) (requiring the PUC to establish "fair and reasonable rates"); (2) the rates are unjustly discriminatory, *American Can*, 55 Or App at 462-63; *see also* ORS 757.310(2) (prohibiting utilities from charging discriminatory rates); or (3) the rates are confiscatory, *see, e.g.*, *Pacific Tel. & Tel. Co. v. Wallace*, 158 Or 210, 297, 75 P2d 942 (1938) (holding that rate order imposed rates that were unconstitutionally confiscatory); *see also* ORS 756.040(1). The legislature has given the PUC the broadest grant of authority— "commensurate with that of the legislature itself"—to carry out ratemaking and other regulatory functions. *Pacific N. W. Bell v. Sabin*, 21 Or App 200, 214, 534 P2d 984, *rev den* (1975).

In conjunction with its consideration of the interests of customers and the public, the PUC sets rates so as to provide a utility with an opportunity to recover its revenue requirement, which is the amount of money the utility must collect to cover its reasonable operating expenses incurred in providing services, as well as a reasonable return on investments made to provide that service. *See* ORS 756.040(1). The rate of return on the utility's investment is intended to ensure the financial integrity of the business, thereby allowing it to continue to provide a service. *See* ORS 756.040(1)(b). For that reason, the rate of return on the investment should be commensurate with that of other enterprises of similar risk. *See* ORS 756.040(1)(a); *Duquesne Light Co. v. Barasch*, 488 US 299, 314, 109 S Ct 609, 617, 102 L Ed 2d 646 (1989).

Generally speaking, the utility's revenue requirement is determined prospectively, by examining a future test period to determine: (1) the utility's allowable operating expenses, including taxes, maintenance, and depreciation; to which is added (2) the utility's investment in property used to provide utility services less depreciation, representing the utility's "rate base" upon which a return may be earned; and (3) a rate of return that should be applied to the rate base to establish the return to which the utility's investors are reasonably entitled. A. J. Gustin Priest, 1 *Principles of Public Utility Regulation: Theory and Application Principles of Public Utility Regulation*, 45 (1969). The rate of return is inherently a judgment call. *Id*. The factors that go into consideration of the rate of return include capital costs and the requirement that the return to investors be commensurate with returns on other investments subject to similar risk and sufficient to ensure the financial viability of the business. *Id*. The rate base is multiplied by the rate of return to allow the utility the *opportunity* to earn a return on its investment, *id*. (emphasis added); a utility cannot be guaranteed a particular return on investment.

Oregon law is consistent with this general description. *See* ORS 756.040; *see also Northwest Public Communications Council v. PUC*, 196 Or App 94, 96, 100 P3d 776 (2004) (describing the traditional procedure for the PUC's review of a regulated utility's rate schedule, including an examination of the proper rate of return on the utility's rate base and adjustment to rates to allow the utility an opportunity to earn the intended rate of return); *Pacific Tel. & Tel. Co. v. Hill*, 229 Or 437, 444, 365 P2d 1020, *on reh'g*, 367 P2d 790 (1961) (describing a "rate base" in the field of public utility regulation as representing "the invested capital upon which the utility is entitled to earn a return"). As the PUC explains in the order in this case,

> "[t]he Commission's ultimate goal is to set rates that provide the utility the opportunity to collect enough revenue to recover reasonable operating expenses and to earn a reasonable return on investments it has made to provide service. To determine how much revenue a utility should be allowed to receive, the Commission uses

a standard ratemaking formula generally expressed as $R = E + (V-d)r$. 'R' represents revenue requirement, 'E' represents allowable operating expenses, 'V' represents rate base, 'd' represents accumulated depreciation, and 'r' represents the rate of return allowed on the rate base."

PUC Order No. 08-487 at 7.

The ratemaking process allows the PUC to set just and reasonable rates based on its forecast of the utility's revenue needs and consideration of the interests of customers and the public. But ratemaking is not the product of a fixed formula that creates a fixed result. The PUC "is not obligated to employ any single formula or combination of formulas to determine what are in each case 'just and reasonable rates.'" *Pacific N.W. Bell*, 21 Or App at 224. And, because rates are set prospectively, they necessarily involve estimates as to the amount of revenue that will be raised, which may be more or less than estimated. As the Supreme Court noted in *Hammond Lbr. Co. v. Public Service Com.*, 96 Or 595, 609, 189 P 639 (1920), the factors involved in ratemaking are "so many and so variable that it is impossible to fix rates that will be mathematically correct or exactly applicable to all the new conditions that may arise even in the immediate future." Thus, "utilities bear the risk of unforeseen costs but also receive the benefit when revenues are higher than predicted." *Industrial Customers of Northwest Utilities v. PUC*, 196 Or App 46, 49, 100 P3d 1072 (2004).

Moreover, the validity of a particular determined rate is measured, not on the individual theories or methodologies used by the PUC, but on the "end result" and whether it is just and reasonable. The Supreme Court has explained that it is "the end result of an order of a regulatory authority which determines the question as to its validity and not the processes by which the authority reached the result." *Valley & Siletz R. R. Co.*, 195 Or at 699.[2]

---

[2] Oregon's focus on determining whether the end result of ratemaking—the rates themselves—is valid is consistent with federal ratemaking. *See, e.g., Federal Power Comm'n v. Hope Natural Gas Co.*, 320 US 591, 602, 64 S Ct 281, 88 L Ed 333 (1944) (stating that if the total effect of the rate order is not unjust or unreasonable, "the fact that the method employed to reach that result may contain infirmities is not then important").

When the PUC approves new rates by order, the utility must file those rates as tariffs for the services provided by the utility. ORS 757.205. Generally, under ORS 757.225, the utility must then charge only those approved rates:

> "No public utility shall charge, demand, collect or receive a greater or less compensation for any service performed by it within the state, or for any service in connection therewith, than is specified in printed rate schedules as may at the time be in force, or demand, collect or receive any rate not specified in such schedule. The rates named therein are the lawful rates until they are changed as provided in ORS 757.210 to 757.220."

*See also Dreyer*, 341 Or at 279 (holding that ORS 757.225 is "a direction to utilities to charge all their ratepayers the PUC-approved rate and, if a utility is dissatisfied with a rate, to obtain a new PUC-approved rate" through the statutory processes set out in ORS 757.210 to 757.220). Although a party may challenge a rate order, *see* ORS 756.561(rehearing and reconsideration); ORS 756.610 (judicial review), the order is presumptively valid during the challenge, ORS 756.565 ("All rates, tariffs, * * * and any order * * * shall be in force and shall be prima facie lawful and reasonable, until found otherwise in a proceeding brought for that purpose under ORS 756.610."), and is not stayed absent the PUC's or a court's order, *see* ORS 756.561(2); ORS 756.610(2).

## II.  FACTUAL AND PROCEDURAL BACKGROUND

We now turn to the decades-long factual and procedural history of the core disputes leading to the order on review in this case, namely, (1) whether, and to what extent, PGE could recover for its investment in the Trojan nuclear generating plant (we concluded in *Trojan I* that PGE could not recover a profit on its Trojan investment); (2) whether the PUC's order of new PGE rates in 2000, which eliminated only prospectively PGE's recovery of profit on its Trojan investment, was sufficient to rectify the PUC's erroneous allowance of PGE rates that had included a profit on the Trojan investment during the 1995 to 2000 period (the Supreme Court in *Dreyer* rejected the PUC's conclusion, based on the "filed rate" doctrine, that it was sufficient); and

now (3) whether, on remand, the PUC properly acted within its discretion and within the scope of the remands of the various PUC orders under judicial review (relevant to that dispute, in *Trojan II*, we reversed the circuit court's order requiring the PUC on remand to revise the new rate structure to offset rates from 1995 to 2000 or else ordering PGE to issue refunds to ratepayers). We examine the litigation history in some detail, given that the parties disagree, and we are divided, on the effect of prior appellate decisions on our current review of the PUC's order on remand.

A.  *PGE prematurely closes Trojan and the PUC allows PGE to recover its unamortized investment in Trojan in declaratory proceeding DR 10*

PGE put the Trojan nuclear plant into service in 1976. At the time, the PUC determined that PGE would be allowed the opportunity to recover its investment in Trojan over a period of 35 years. *Trojan II*, 215 Or App at 363. However, as a result of various breakdowns and problems with the plant, PGE closed Trojan in 1993, before the full amount of PGE's capital investment in the facility had been recovered in rates. *Id*. PGE did so after it presented the PUC with a "least cost" plan that taking Trojan out of service and purchasing power instead would result in the least cost to ratepayers and was in the public interest, and the PUC found in a 1993 order that closing Trojan was reasonable under a "least cost" theory. *Id*. at 364; *Dreyer*, 341 Or at 265-66.

The retirement of Trojan resulted in the first core dispute: a lengthy, complex controversy over whether and to what extent PGE could recover its remaining undepreciated investment in the plant under ORS 757.140(2). That statute permitted the PUC to "allow in rates" amounts that the PUC "finds represent undepreciated investment" in a utility plant retired from service, if the PUC finds that the "retirement is in the public interest."

Shortly after the plant's closure, PGE asked the PUC for a declaratory ruling as to whether PGE could recover its unamortized capital investment in Trojan under

ORS 757.140(2). In the declaratory ruling proceeding, DR 10, the PUC permitted PGE to include *in its rate base* the remaining undepreciated, or unamortized,[3] investment in that plant, if it could establish, among other facts, that closing Trojan was in the public interest. That was a significant decision, because PGE not only could recover the principal amount of the investment in Trojan, but PGE had the additional potential to earn a return on the unamortized investment and to obtain even higher rates from ratepayers as a result.[4]

B. *The PUC's rate order in rate case UE 88, allowing PGE to recover most of its unamortized investment in Trojan, plus a return on that investment*

PGE then filed a general rate case, UE 88, seeking to raise overall rates, in part to allow PGE to recover the net unamortized Trojan investment. As the PUC ruled in DR 10, a significant predicate issue for purposes of determining whether PGE could recover its unamortized investment was whether closing Trojan was in the public interest. The PUC applied a "net benefits" test to decide whether the closure of Trojan was in the public interest, comparing the allowable projected costs of continuing to operate the plant with the allowable projected costs of closure, and found that Trojan's closure was in the public interest.

The PUC also concluded that, of PGE's total net unamortized investment in Trojan, it was in the public's interest to allow recovery of approximately $250.7 million, disallowing approximately $37.5 million (after taxes), even though Trojan was not, and would not be, available to produce electricity for sale to PGE's customers or others. The rates allowed PGE to recover, over a 17-year period,

---

[3] At times, the statutes or the record refer to an "undepreciated" rather than "unamortized" amount. For the purposes of this case, the two words appear to have the same meaning. We will follow the PUC's example and generally use "unamortized" to refer to the relevant concept.

[4] As previously explained, establishing a utility's rate base—which is the utility's total capital investment—is a fundamental part of the ratemaking process. A utility's total revenue requirement—which is the amount that the utility is entitled to attempt to recover in its rates—includes a return on the utility's rate base at a percentage that the PUC establishes as part of the ratemaking process. Thus, in general, the larger the rate base, the larger the revenue requirement, and, concomitantly, the higher the rates will be.

its investment in Trojan, as part of PGE's expenses. Based on the legal framework adopted in DR 10, the PUC also allowed PGE to include an unamortized after-tax Trojan investment of $250.7 million in its rate base. Thus, in its ratemaking decision in UE 88, effective April 1, 1995, the PUC permitted PGE a recovery of and a return on most of its unamortized investment in Trojan. The PUC made its decision regarding the rate treatment of PGE's unamortized Trojan investment in conjunction with other decisions on proposed rate elements and methodologies used to set PGE's rates, including revenue treatment of Trojan's decommissioning costs and the sale of a part of PGE's Boardman generating facility.

C.  *Trojan I: judicial review of PUC orders in DR 10 and UE 88*

In *Trojan I*, the Citizens' Utility Board of Oregon (CUB), URP, and other parties challenged the PUC's orders in both DR 10, the declaratory order proceeding, and in UE 88, the ratemaking case,[5] in the Marion County Circuit Court.[6] *See Trojan I*, 154 Or App at 706 n 1 (providing details of the orders at issue). In separate rulings by different judges, the circuit court affirmed the declaratory orders in DR 10 but reversed and remanded the rate order in UE 88. *Trojan I*, 154 Or App at 706.

In consolidated appeals in *Trojan I*, the plaintiffs argued that the PUC had erred in determining that a portion of the unamortized Trojan investment could be included in PGE's rate base, allowing PGE to earn a return on it. The plaintiffs contended that the PUC's ruling violated ORS 757.355, which was adopted as an initiative measure in 1978. *Trojan I*, 154 Or App at 707. At the applicable time, that statute provided:

"No public utility shall, directly or indirectly, by any device, charge, demand, collect or receive from any customer rates which are derived from a rate base which includes

---

[5] Specifically, those were PUC Order No. 93-1117 and PUC Order No. 93-1763 in DR 10 and PUC Order No. 95-322 in UE 88.

[6] Before 2005, the circuit court had jurisdiction to review PUC decisions, subject to appeal to this court. *Former* ORS 757.580, *repealed by* Or Laws 2005, ch 638, § 21. Since then, this court reviews those decisions directly. ORS 756.610(1).

within it any construction, building, installation or real or personal property not presently used for providing utility service to the customer."[7]

ORS 757.355 (1993).

In response, the PUC and PGE argued that ORS 757.140(2), which the legislature adopted in 1989 at the PUC's request, was the only statute relevant to a retired power generation plant and permitted including PGE's unamortized investment in Trojan in its rate base. *See Trojan I*, 154 Or App at 707-08. As enacted in 1989, ORS 757.140(2) provided:

"In the following cases the commission may allow in rates, directly or indirectly, amounts on the utility's books of account which the commission finds represent undepreciated investment in a utility plant, including that which has been retired from service:

"(a) When the retirement is due to ordinary wear and tear, casualties, acts of God, acts of governmental authority; or

"(b) When the commission finds that the retirement is in the public interest."

In *Trojan I*, we harmonized the two statutes by holding that ORS 757.140(2) permitted a utility to receive the return *of* its actual investment in such property, but that ORS 757.355 prohibits a utility from receiving any return *on* property that it is not presently used to provide utility service to its customers. 154 Or App at 713. If property is in a utility's rate base, the utility will receive a return *on* it as it does for the rest of its capital investment in the rate base. However, amounts that are credited to amortization of a utility's property are part of the utility's expenses, not its rate base. While they are thus part of the utility's revenue requirement, the utility receives only a return *of* the amortized amount, not a return *on* it; *i.e.*, although the utility can recover through its rates a return of its capital investment in retired facilities, it can receive no profits on those investments.

---

[7] The legislature amended ORS 757.355 in 2003, primarily to modify the statute's application to water utilities. Or Laws 2003, ch 202, § 2. The parties do not argue that the amendment has any effect on this case. All references in this opinion to ORS 757.355 are to the statute as it existed before the amendment.

We also agreed with CUB's argument that "where statutes containing specific provisions relating to rates are applicable, they control and narrow PUC's general authority in the specific circumstances to which they apply." *Id.* at 715. We recognized that the legislature has delegated broad authority—essentially as broad as that of the legislature itself—to the PUC for the exercise of its regulatory functions. However, we said that ORS 757.355 and ORS 757.140(2) are exceptions to that broad delegation. Those statutes require the PUC to follow the precise legislative policy that they contain and do not delegate to it any discretion whether to follow that policy. Thus, we held, the courts, not the PUC, are to decide the meaning and effect of those statutes. *Id.* at 714-15.

We summarized our decision as holding that

"ORS 757.335 precludes PUC from allowing rates, of the kind its orders here would allow, that include a rate of return on capital assets that are not currently used for the provision of utility services. * * * The general grants of authority in ORS 756.040 and other general statutes do not empower PGE to charge or PUC to approve rates of a kind that are specifically contrary to the limitations in ORS 757.355 and ORS 757.140(2)."

*Id.* at 716-17.[8] We instructed the circuit court to remand for reconsideration by the PUC the orders in DR 10 and affirmed the circuit court's judgment reversing and remanding the rate order in UE 88. *Id.* at 717.

The Supreme Court allowed the PUC's and PGE's petitions for review of our decision concerning the PUC's orders in DR 10 and UE 88 in *Trojan I.* 328 Or 464, 987 P2d 513 (1999). At about the same time, the legislature adopted a bill that would have expressly overruled that decision. *See Trojan II,* 215 Or App at 366. However, that bill was referred to the 2000 general election, and the people rejected it. *Id.*

---

[8] We rejected the PUC's and PGE's attempts to uphold the pre-October 2000 rates by calling the return on PGE's investment "interest" rather than "rate of return." We held that ORS 757.355 "does not allow public utilities to obtain a profit from ratepayers on their investments in facilities that are not used to serve ratepayers. It makes no difference whether the profit is called 'interest' instead of a 'return.'" *Trojan I,* 154 Or App at 714. We discuss below the distinction between the interest that we described in *Trojan I* and the interest that the PUC approved in the order on review.

In any event, before the election, PGE and CUB, but not URP or the other petitioners, reached a settlement before the PUC that purported to resolve all outstanding issues related to PGE's rates as a result of the premature Trojan shutdown. *Id.*

D.  *The CUB/PGE settlement and the PUC's approval of new rates post-September 30, 2000*

The CUB/PGE settlement was effective October 1, 2000, and was intended to put an end to any recovery by PGE of a return on the remaining Trojan investment on a prospective basis. *Dreyer*, 341 Or at 269-70. The settling parties agreed to offset sums that PGE could collect from ratepayers, including the return of the remainder of its principal investment in Trojan, against existing balances that PGE owed to its ratepayers. Through the settlement, PGE would be entitled to collect over $47 million for certain tax deductions that benefited ratepayers early in the life of Trojan, plus PGE's remaining investment balance in Trojan, that is, the return of its capital investment in Trojan, a sum of $180.5 million. Those amounts were offset against $161.9 million in credits owed to ratepayers because of the sale of PGE to the Enron conglomerate in 1996 and several other balances running in favor of ratepayers. *Id.* at 269 n 1. URP objected, primarily arguing that most of the $180.5 million credit to PGE in the settlement for its Trojan investment was actually prohibited return *on* PGE's investment and not return *of* its investment. *Id.* at 269 n 9.

Then, with CUB's approval, PGE sought and obtained the PUC's implementation of the settlement. PGE applied to the PUC in UM 989 for an accounting order and a revised schedule of rates. *Dreyer*, 341 Or at 269. At the end of September 2000, the PUC implemented the settlement through PUC Order No. 00-601, *Trojan II*, 215 Or App at 366, to the dismay of URP and others. Thereafter, PGE's rates did not purport to include any amounts related to Trojan. *Dreyer*, 341 Or at 269. The settlement, and the PUC's consequent approval of new rates for PGE, spawned the second core dispute: whether, despite the settlement and the new tariff rates, PGE still owed money to ratepayers based on the rates it had charged during the 1995 to 2000

period while the unamortized investment in Trojan was in PGE's rate base.

E. *The remand to the PUC in Trojan I*

After the CUB/PGE settlement, PGE asked the Supreme Court to vacate our decision in *Trojan I* and to remand the case to the circuit court with instructions to vacate the judgment and dismiss all claims as moot; that court, however, simply dismissed the petitions for review in 2002, leaving our decision in effect. *Dreyer*, 341 Or at 269-70; *Citizens' Utility Board v. PUC*, 335 Or 91, 58 P3d 822 (2002). Thereafter, this court entered an appellate judgment in accordance with our decision in *Trojan I*. Again, in our disposition, we reversed and remanded the circuit court judgments concerning the orders in DR 10, "with instructions to remand orders to PUC for reconsideration," *Trojan I*, 154 Or App at 717, and affirmed the court's judgment reversing and remanding the rate order in UE 88, because PGE was not entitled to a return on its unamortized investment in Trojan.

The Marion County Circuit Court received the appellate judgment in the fall of 2003. In turn, that court remanded the orders in *Trojan I* to the PUC "for further proceedings consistent with the opinion and orders of the Court of Appeals." *Dreyer*, 341 Or at 270.

F. *URP's challenge to the rates resulting from the CUB/ PGE settlement before the PUC*

Meanwhile, URP filed a complaint before the PUC in UM 989 to challenge the resulting rates that the PUC had approved and that were effective as of October 1, 2000. URP argued to the PUC that the rates were unsatisfactory, because they provided only prospective relief to ratepayers and provided no mechanism for returning to ratepayers money that PGE had collected unlawfully between 1995 and 2000 as a return *on* its Trojan investment. *Dreyer*, 341 Or at 270. URP also asserted a number of other arguments: The settlement allowed PGE the functional equivalent of a return on its investment; the treatment of the tax deductions that PGE had received credit for was improper; taxpayers were not getting credit from a nuclear electric insurance

policy; PGE had improperly received credit for construction work in progress; and other criticisms of various specific items and associated sums that were derived for use in the settlement and in setting the approved rates going forward as of October 1, 2000. *Trojan II*, 215 Or App at 366-67.

In PUC Order No. 02-227, the PUC rejected all of URP's arguments challenging the approved rates post-September 30, 2000. *Id.* at 367. Specifically with respect to URP's argument that the PUC should have instead returned money to ratepayers, the PUC expressed doubt over its authority to order refunds or otherwise to restore to ratepayers the part of PGE's earlier rates that provided a return on PGE's Trojan investment. In reaching that conclusion, the PUC relied on the "filed rate doctrine." *Dreyer*, 341 Or at 270 n 10. The filed rate doctrine "holds, generally, that any rate filed with and approved by the relevant ratemaking agency represents a contract between the utility and the customer and is conclusively lawful until a new rate is approved." *Id.* The PUC also reasoned that, in any event, the proposed rates that PGE and CUB had settled upon post-September 30, 2000, were in the public interest and resulted in "just and reasonable rates." *Id.* at 270.

G. *The Marion County Circuit Court's remand of PUC Order No. 02-227 concerning the post-September 30, 2000, rates and the PUC's initiation of a joint remand proceeding*

In 2002, URP filed an action in Marion County Circuit Court under *former* ORS 756.580, seeking review of PUC Order No. 02-227 rejecting URP's challenges to the rate order that implemented the CUB/PGE settlement in UM 989. *Trojan II*, 215 Or App at 367. The circuit court decided the case in URP's favor. *Id.*

The circuit court determined that, due to the PUC's error of law in applying the filed rate doctrine, the PUC erroneously "preclude[d] relief to recover past unlawful charges" by PGE to recover a return on the unamortized Trojan investment and, consequently, the rates were unjust and unreasonable. *Id.* The court held that there was no logical or legislative support for the PUC's view that the filed rate doctrine precludes the PUC from refunding to

ratepayers rates collected by a utility pursuant to a rate that a court later declares unlawful. *Dreyer*, 341 Or at 271. The circuit court further concluded that PGE "should have been required to account for all refunds due to rate payers for these unlawfully collected rates as a matter of law." *Trojan II*, 215 Or App at 368.

The circuit court did not stay its decision pending the PUC's and intervenor PGE's appeal to this court but instead reversed and remanded PUC Order No. 02-227 with instructions for the PUC either to revise and reduce the existing rate structure

"so as to fully and promptly offset and recover all past improperly calculated and unlawfully collected rates, or alternatively, to order PGE to immediately issue refunds for the full amount of all excessive and unlawful charges collected by the utility for a return on its Trojan investment as previously determined to be improper[.]"

In response, and simultaneously with the appeal of the circuit court's judgment to this court in *Trojan II*, the PUC decided that it would consider PUC Order No. 02-227 in UM 989 on remand, along with the three orders in DR 10 and UE 88 that had been remanded in *Trojan I*, in a joint or hybrid proceeding.[9] *Dreyer*, 341 Or at 272.

As a result, in 2004, the PUC issued an order in which it addressed the process on remand. As the Supreme Court described the process in *Dreyer*,

"the PUC decided to proceed with the two remands together, but in two phases, with the first phase devoted to determining '[w]hat rates would have been approved in [PUC Order No. 95-322] if ORS 757.355 [(1993)] had been interpreted to prohibit a return on Trojan,' and the second phase devoted to reconciling the results of Phase I with the rates that actually were approved."

341 Or at 272 (quoting PUC Order No. 04-597).[10]

---

[9] This court ultimately agreed with the PUC in *Trojan II* that the circuit court's remand was erroneous. 215 Or App at 374. We discuss that decision in more detail later in this opinion.

[10] The PUC and the parties also engaged in Phase III, the scope of which was set forth in a ruling in February 2008 after this court's decision in *Trojan II*. Basically, Phase III addressed the remand of PUC Order No. 02-227 and the post-September 30, 2000, rates.

H.  *Dreyer: CAPs' class action against PGE and the Supreme Court's decision in PGE's mandamus challenge*

While the PUC's appeal concerning PUC Order No. 02-227 was pending before this court in *Trojan II*, the CAPs filed a putative class action against PGE, also in Marion County Circuit Court. In that action, the CAPs sought to recover damages from PGE for overcharges during the period from April 1, 1995, to September 30, 2000, when PGE was collecting rates that included a return on PGE's unamortized investment in Trojan as a result of the PUC's decisions in DR 10 and UE 88. *See Trojan II*, 215 Or App at 368-69.

The circuit court granted the CAPs' motion to certify the class. The circuit court denied PGE's motion to dismiss the claims and granted the CAPs' motion for partial summary judgment on two of their claims. PGE then challenged those rulings by petitioning the Supreme Court for writs of mandamus. In *Dreyer*, the Supreme Court issued alternative writs but, after considering the merits, denied PGE's petition for a peremptory writ ordering the circuit court to deny class action status or to dismiss the case. It did, however, issue a peremptory writ ordering the circuit court to abate the case so that the PUC could exercise its primary jurisdiction over the issues in dispute. *Dreyer*, 341 Or at 286-87.

The court in *Dreyer* first noted its standard of review under the extraordinary remedy of a writ of mandamus. The court explained that a writ of mandamus to compel a court's decision is available only when the law *requires* a particular decision, and that such writs are not ordinarily available when there is a plain, speedy, and adequate remedy in the ordinary course of law. *Id*. at 276. Thus, the court explained, to obtain the remedy of dismissal of the claims, "PGE must persuade us that the law requires dismissal of plaintiffs' actions and that the ordinary remedy of reversal on appeal is inadequate." *Id*.

The court then proceeded to consider PGE's arguments, beginning with PGE's contention that none of plaintiffs' four claims had any basis in law. The CAPs relied on ORS 757.355 (1993) as the source of one of their

claims, asserting that, in charging rates that included a return on the Trojan investment, PGE had violated that statute, which prohibits a utility from receiving rates that are derived from a rate base that includes property not presently used for providing utility service. In its opinion in *Dreyer*, the Supreme Court first considered PGE's position, which the PUC supported, that, as a matter of statutory construction, the only plausible reading of ORS 757.355 is that it is directed to the PUC, rather than to utilities, and that the statute provides no independent basis for a civil claim. Underlying PGE's argument was the premise that ORS 756.225 prohibited PGE from charging other than the published, PUC-approved, rates during the pre-October 2000 period. PGE argued that ORS 757.225 made the published rate conclusively lawful for all purposes until a change occurred.

In rejecting PGE's contention, the Supreme Court in *Dreyer* reasoned that, if accepted, PGE's position would make it impossible for customers to recover amounts that PGE had received under the published rates, even if those rates were subject to a challenge in court and were ultimately determined to be excessive or otherwise unlawful. 341 Or at 278-79. The Supreme Court held that the most reasonable reading of ORS 757.225 was as a directive to utilities to charge the PUC-approved rates and, if dissatisfied with those rates, to seek a new PUC-approved rate; the statute does not conclusively and permanently bind the entire world to PUC's rate decisions. *Id.* at 279.[11] In other words, the statute in and of itself does not absolutely

---

[11] The court explained:

"We share plaintiffs' skepticism of the proposition that is at the heart of PGE's argument—that ORS 757.225 manifests a legislative intent that PUC-approved rates be treated as conclusively lawful for all purposes 'until they are changed as provided in ORS 757.210 to 757.220.' We find it significant that, although the public utility statutes provide more than one process for changing the filed rates for a utility, ORS 757.225 refers to only one such process—the utility-initiated process 'provided by ORS 757.210 to 757.220.' If PGE's interpretation of ORS 757.225 were correct, then only rate changes adopted pursuant to the utility-initiated ratemaking process at ORS 757.210 to 757.220 would be valid. A necessary corollary of that interpretation would be that rate changes adopted under any alternative process provided in the statutes, including the ratepayer- or PUC-initiated process set out at ORS 756.500 to 756.515, would not produce a binding change to the 'lawful' rate. Those two propositions do not persuade us.

shield a utility from having to return any part of its rates that later is adjudged to be unlawful. *Id*. at 278. Because the court rejected PGE's contention that ORS 757.355 (1993) has no application to the conduct of utilities, the court rejected PGE's derivative contention that the CAPs' first claim had no basis in law, and it declined to order the circuit court to dismiss the complaints. *Id*. at 279-80. Thus, the court explained, consonant with its standard of review on mandamus,

> "[b]ecause PGE has failed to persuade us that plaintiffs' first claim is legally untenable, we need not consider its similar challenges to the other three claims. If even one of plaintiffs' claims is viable, then the law cannot compel the dismissal of the complaints on the theory that none of the claims has any basis in the law."

*Id*. at 280.

The court also rejected PGE's argument that the CAPs' claims necessarily involved ratemaking that was within the PUC's sole jurisdiction. PGE argued that, in order for the CAPs to prevail, the jury would have to decide what "fair and reasonable" rates the PUC would have set if it had not made an error and compare that rate to the one actually charged during the relevant period. Doing so, PGE argued, would necessarily make the jury, not PUC, the ultimate determiner of the rates. The Supreme Court responded that although, theoretically, that was one way that the jury could go about deciding the question of

---

"Based on the foregoing, we therefore agree with plaintiffs that ORS 757.225 is most reasonably read as a direction to utilities to charge all their ratepayers the PUC-approved rate and, if a utility is dissatisfied with a rate, to obtain a new PUC-approved rate through the process set out at ORS 757.210 to 757.220. The statute is not aimed, as PGE suggests, at conclusively and permanently binding the entire world to the rate decisions of the PUC.

"It follows that, in the context of the present controversy, there is no necessary conflict between ORS 757.225 (directing utilities to charge the filed rate and to seek a rate change if that filed rate is unsatisfactory) and a natural reading of ORS 757.355 (1993), *i.e.*, as a prohibition directed at utilities. And, because we do not accept PGE's contention that ORS 757.355 (1993) has no application to the conduct of utilities, we cannot accept its derivative contention that plaintiffs' first claim has no basis in the law."

*Dreyer*, 341 Or at 278-80 (footnotes omitted).

damages—and that method arguably would invade the PUC's exclusive ratemaking authority—it was not the only possible approach. The court said that the jury "could simply attempt to determine what part of the rates that the PUC had approved as 'fair and reasonable' in fact represented a return on PGE's investment in Trojan and, therefore, were unlawful under ORS 757.355 (1993)." *Dreyer*, 341 Or at 282. The court therefore rejected PGE's argument that the circuit court was without jurisdiction to hear plaintiffs' claims because they necessarily involved ratemaking or pertained to utility regulation. *Id.*

Thus, the Supreme Court concluded that the law did not *require* dismissal of plaintiffs' actions and that mandamus therefore was not available. However, the court reasoned that the doctrine of primary jurisdiction required that the CAPs' action defer to the proceeding on remand already underway at the PUC concerning the three PUC cases in which the PUC's orders had been remanded by the courts: DR 10, UE 88, and UM 989. The court determined that the circuit court had a legal duty to abate the proceedings pending resolution of the matters on remand to the PUC involving essentially the same controversy, because "the PUC proceeding that is underway thus has the potential for disposing of the central issue in these cases, *viz.*, the issue whether plaintiffs have been injured (and, if they have been, the extent of the injury)." 341 Or at 285. Depending on how the PUC responds to the issues on remand, the court explained, "some or all of plaintiff's claimed injuries may cease to exist." *Id.*[12] The court reasoned that judicial action before the PUC had completed its work would interfere with the agency's performance of its regulatory functions. Thus, in 2006, the Supreme Court ordered the circuit court to abate the class action until the PUC had acted. *Id.* at 285-87.

---

[12] The court noted in *Dreyer* that pending before the PUC was the circuit court's remand in *Trojan II*, in which that court had instructed the PUC to "either revise and reduce rates to offset the previous 'improperly calculated and unlawfully collected rates' or to order PGE to issue refunds." 341 Or at 285. The court did not comment on that remand instruction, but it noted that the circuit court judgment in *Trojan II* was on appeal in this court. *Id.* at 272. As explained below, this court subsequently vacated the circuit court's judgment as well as its instructions on remand in *Trojan II*. 215 Or App at 374.

I. *Trojan II: This court's reversal of the circuit court's decision concerning PUC Order No. 02-227, the new PGE rates, and the instructions on remand to the PUC*

Finally, *Trojan II*[13] was the appeal from the circuit court's judgment reversing and remanding PUC Order No. 02-227 based on URP's challenge to the rates resulting from the CUB/PGE settlement. The PUC had concluded that ORS 756.225 did not allow a retroactive change in rates, pursuant to a court decision or otherwise. Based on that understanding of the statute, the PUC had refused to consider the amounts that PGE received as a return on its Trojan investment between April 1, 1995, and September 30, 2000, in evaluating the rates that became effective on October 1, 2000.

In *Trojan II*, we said that the Supreme Court's decision in *Dreyer*, which issued while *Trojan II* was pending on appeal, made it clear that the PUC had erred in its assumption about the effect of ORS 756.225 and the filed rate doctrine. 215 Or App at 373. We also said that, before the circuit court or the Court of Appeals could order the PUC to provide a refund or engage in retroactive ratemaking, "the PUC must determine—in the agency proceedings that are currently under way—whether it has authority and will exercise its authority to take those actions." *Id.* at 376. Thus, we vacated the circuit court's judgment and remanded the case for the PUC's reconsideration of PUC Order No. 02-227 "in light of the Supreme Court's decision in *Dreyer*, this court's opinion in [*Trojan I*], and the PUC's own joint remand proceedings." 215 Or App at 376.[14]

---

[13] *Utility Reform Project v. PUC*, 215 Or App 360, 170 P3d 1074 (2007).

[14] The PUC's order on review in *Trojan II* included a determination that it had no authority to order refunds based on the filed rate doctrine, but that position was eviscerated by *Dreyer*. In keeping with *Dreyer*, we concluded:

"In light of that error of law, we cannot determine whether there is a rational relationship between the facts and the legal conclusions reached by the PUC. Whether the rates established by Order No. 02-227 are unlawful or unreasonable depends, in part, on the correct calculation of the Trojan balance, including the proper treatment of any charges collected unlawfully by PGE. It is possible that, for reasons apart from ORS 757.225, the PUC would conclude that it has no authority to engage in retroactive ratemaking or to issue a refund. It is also possible that the PUC would conclude that, absent any prohibition in ORS 757.225, it does, in fact, have authority to issue refunds or

We therefore affirmed the circuit court to the extent that it remanded the case to the PUC for it to reconsider those rates without the limitations that the PUC had previously believed ORS 757.225 imposed on it. However, we also held that the circuit court's *order requiring the PUC either to revise the rate structure or to order a refund* of the unlawfully collected charges was erroneous. 215 Or App at 374. Rather, "the question of the PUC's authority to engage in retroactive ratemaking or to order a refund needs to be decided *by the PUC.*" *Id.* at 375 (emphasis in original).

## III. ANALYSIS OF THE PUC'S ORDER ON REMAND

We turn to PUC Order No. 08-487, the PUC's September 30, 2008, order that is presently before us on remand of the three PUC orders in DR 10 and UE 88 and PUC Order No. 02-227 in UM 989. The PUC consolidated the challenges to the pre-October 2000 rates and the post-October 2000 rates in one proceeding and sought to resolve all outstanding issues related to the Trojan closure. After *Trojan II*, the joint proceedings on remand to the PUC provided another forum for the third core dispute involved in the litigation: What was within the scope of the remands and what discretion did the PUC have to reconsider its orders, including the rate orders governing rates before and after the CUB/PGE settlement?

### A. *Summary of PUC Order No. 08-487*

After extensive contested proceedings on remand, the PUC issued a 106-page order. The PUC ordered the following:

"1. The rates for electric service provided by Portland General Electric Company from April 1, 1995, through September 30, 2000, were just and reasonable.

---

otherwise account for unlawfully collected charges. In any event, we conclude that the PUC should be the first to consider those issues[.]"

*Trojan II*, 215 Or App at 373. Because we vacated the circuit court's judgment, we declined to reach issues URP had raised on cross-appeal, leaving it all to the PUC on remand. Thus, we permitted the PUC to review PGE's rates as a result of the settlement. We noted that "some of the issues in the cross-appeal may arise again on remand to the PUC, but depending on the outcome of the remand, the issues may arise differently or not at all." *Id.* at 376.

"2. The rates for electric service provided by Portland General Electric Company from October 1, 2000, through September 30, 2001, were just and reasonable.

"3. Portland General Electric Company must, pursuant to the mechanism described in this order, refund $33.1 million to customers who received service from October 1, 2000, to September 30, 2001. The refund amount must continue to earn interest at 9.6 percent, compounded monthly, from October 1, 2008, until the time that the refunds are issued.

"4. Portland General Electric Company may seek recovery of the incremental administrative costs of implementing the refund mechanism by seeking a deferral of costs through an application filed pursuant to ORS 757.259.

"5. Utility Reform Project's and the Class Action Plaintiffs' motion to exclude issues filed on September 12, 2008, is denied.

"6. To the extent necessary to be consistent with this order, Order Nos. 95-322 and 02-227 are amended."

PUC Order No. 08-487 at 106.

In its order, the PUC explained the procedural history on remand. First, the PUC concluded that, in *Trojan I*, this court decided that the rates the PUC had approved in UE 88 were "based on an error of law—the conclusion that PGE's undepreciated Trojan investment could be included in the rate base, giving PGE the opportunity to collect a *return on* the investment." PUC Order No. 08-487 at 21 (emphasis in original). In other words, the PUC concluded, we found "that a single component used in calculating overall rates was based on an erroneous statutory interpretation." *Id.* at 22. And, we "offered no opinion on how that error of law affected the legality of the rates as a whole" and "provided no specific instructions to the Commission to issue refunds." *Id.*

The PUC also examined the effect of the *Dreyer* decision on the proceedings on remand. In general, as relevant to the PUC's order concerning PGE's rates in this case, the PUC concluded that *Dreyer* rejected PGE's view of the filed rate doctrine, namely, as a shield to liability for the rates that included a profit on the Trojan investment

before October 2000. The PUC concluded that, at the same time, the Supreme Court had left open the question of the scope of the PUC's remedial authority for the PUC's initial determination, recognizing the PUC's primary jurisdiction to determine whether there was any harm and, if so, to determine what remedy it could provide to customers. PUC Order No. 08-487 at 50.

After examining URP's and the CAPs' procedural challenges in the remand proceedings, the PUC reexamined PGE's April 1, 1995, to September 30, 2000, rates to determine the effect of the error of including in the rate base a return on PGE's investment in Trojan and whether the plaintiffs had been damaged, in accordance with the "well-established principle that it is the legality of the end result of the ratemaking process, and not the legality of each calculation or input used during that process, that control[s]." *Id.* at 22. As the Supreme Court understood and observed in *Dreyer*, the PUC was determining what pre-October 2000 rates would have been if it had understood at that time that the statutes prohibited a return on Trojan, and then the PUC would decide how to reconcile that rate with the rates that actually were approved. *Dreyer*, 341 Or at 272.

Because the retrospective examination of rates is an unusual exercise, the PUC examined the framework for its analysis at length. PUC Order No. 08-487 at 55-77. It considered and rejected URP's contention that the reconsideration involved simply a ministerial calculation of an appropriate refund amount based on the removal of the inappropriate factor. Instead, based on the understanding that ratemaking decisions are not made in isolation and that individual rate elements are frequently interdependent, the PUC chose to undertake a more comprehensive review of the ratemaking decisions in UE 88 to determine whether the error had rendered rates during the 1995 to 2000 period unjust and unreasonable. *Id.*

The PUC accordingly reevaluated those elements of the pre-October 2000 rates that it determined were directly and indirectly affected by its legal error in allowing PGE to recover a return on its Trojan investment. Not

surprisingly, that reexamination resulted in a modification of several components in ways that affected PGE's revenue requirements and, thus, its rates. Specifically, the PUC reexamined and changed the amortization period for PGE's remaining investment in Trojan from 17 years to 10 years, thus increasing PGE's expenses for each of the years at issue; it awarded PGE interest at a little over seven percent on the Trojan balance to reflect the time value of money to ensure PGE's financial integrity and its ability to attract capital; and, because the costs of closure would have been lower than the costs of continued operation of Trojan, it restored $26.8 million of the investment balance that it had previously disallowed.

The PUC noted that, in its UE 88 rate order, it had determined that PGE's closure of Trojan in 1993 was a least-cost option for the utility and its customers. That is, the costs associated with closing Trojan and replacing its output with purchased power were less than the costs associated with repairing or replacing the steam generators and continuing to operate the plant. The PUC concluded that the exclusion of a return on the unamortized investment in the facility from the rate base further reduced the plant's closing costs, to the benefit of customers. With those calculations, the net result of the changes to the revenue requirement approved in UE 88 was that PGE's rates during the period from April 1, 1995, through September 30, 2000, would have been $4.03 million *higher* than PGE's authorized rates during that time. That is, the PUC determined that, had the PUC properly excluded PGE's undepreciated Trojan investment from the rate base, thereby eliminating any profit or return on the Trojan investment, and allowed PGE to recover its remaining Trojan balance over a 10-year period with interest, customers would have been required to pay $4.03 million more during the 1995 through 2000 time period. Thus, the PUC concluded, the legal error in including the return on Trojan in calculating the rates in UE 88 did not result in unjust and unreasonable rates and did not harm the ratepayers and, therefore, there was no need to consider reparations or a refund.

The PUC's reevaluation of the pre-October 2000 rates did, however, have an impact on the rates thereafter,

which were approved in UM 989 after the CUB/PGE settlement. PGE had received credit in the settlement for its investment in Trojan based on amortizing the remaining balance over a 17-year period from 1995. Changing the amortization period to 10 years from 1995 meant that the unamortized balance on October 1, 2000, was about $15.4 million less than the parties had believed at the time of the settlement. PGE had thus received a larger credit in the settlement than it was entitled to receive under the PUC's reevaluation of the pre-October 2000 rates. The PUC determined that it had the remedial authority to require PGE to refund that amount, together with accrued interest, to its customers, relying in large part on ORS 756.040; its broad regulatory authority; and *Pacific Northwest Bell Telephone Co. v. Katz*, 116 Or App 302, 841 P2d 652 (1992), *rev den*, 316 Or 528 (1993). PUC Order No. 08-487 at 26-42. The PUC therefore ordered PGE to issue refunds sufficient to resolve that difference. With that exception, the PUC concluded that the post-September 30, 2000, rates were just and reasonable. In accordance with the order, PGE subsequently refunded the amount to its customers.[15]

B. *The PUC's authority on remand*

On judicial review, we are presented with the question of whether PUC Order No. 08-487 complies with judicial requirements on remand. The fundamental issue on judicial review is whether the PUC's action in reevaluating the entire rate structure for the period between April 1, 1995, and October 1, 2000, rather than simply isolating the effect on the previously approved rates of including Trojan in the rate base, was within the PUC's authority on remand.[16]

The PUC and PGE argue that, in the previous appellate court decisions, the Supreme Court and we did

---

[15] Including interest, at the time of the order, the total refund due was $33.1 million. By the time that PGE paid the refund, the amount had risen to approximately $37 million.

[16] Although the alleged unlawful rates were those in effect between April 1, 1995, and September 30, 2000, no party or court has suggested that rates for that period may be retroactively modified. The only question has been whether plaintiffs were damaged by those rates and what remedy, if any, is available from the PUC.

not—and, indeed could not—second-guess the PUC's exercise of its delegated authority to make rates.[17] All that those decisions held, according to the PUC and PGE, was that the PUC had erroneously applied one of the many elements in the ratemaking process. According to the PUC, consideration of an unlawful factor in ratemaking has the same effect as improper consideration of lawful factors, and the PUC's job is to reconsider its previous actions as a package, not to isolate the effect of a single factor. It argues that rates that result from the process are lawful if they are fair and reasonable; it is the result of the process, not the process itself, that matters.

URP and the CAPs, in contrast, argue that, because the pre-October 2000 rates included consideration of a factor that the legislature, as a matter of policy, has expressly prohibited the PUC from considering, the resulting rates are by that very fact unlawful, not because the PUC misapplied one of the many considerations that normally go into ratemaking, but because the rates are outside the authority that the legislature has delegated to the PUC. For that reason, they argue, the question of the overall fairness or reasonableness of the rates does not arise. With an unlawful rate, URP and the CAPs contend, the only action that the PUC has the authority to take is to determine the amount by which the unlawful factor resulted in an enhanced rate, above what the rate would have been without that factor. Thus, the CAPs and URP assert, the PUC acted beyond its authority when it redetermined what the rates would have been without the inclusion of the undepreciated Trojan investment in the rate base and adjusted its treatment of the legal factors that went into the creation of those rates.

We agree with the PUC that, when confronted with a judicial determination that it had unlawfully required inclusion of a return on PGE's undepreciated Trojan investment, the PUC had authority and, indeed, had a duty, to determine whether the unlawful inclusion of that

---

[17] We review the PUC's order in accordance with the applicable standards for judicial review of an agency's order as found in ORS 183.482(8) and previous appellate decisions. *See* ORS 756.610(1) (with an exception not relevant here, "final orders of the Public Utility Commission are subject to judicial review as orders in contested cases under the provision of ORS 183.480 to 183.497").

component in the rate base had the effect of rendering the rates unjust and unreasonable. The legislature has authorized the PUC, in regulating the rates of public utilities within its jurisdiction, to

> "make use of the jurisdiction and powers of the office to protect [utility] customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates. The commission shall balance the interests of the utility investor and the consumer in establishing fair and reasonable rates."

ORS 756.040(1).[18] The same statute defines "fair and reasonable rates" in broad terms:

> "Rates are fair and reasonable for the purposes of this subsection if the rates provide adequate revenue both for operating expenses of the public utility *** and for capital costs of the utility, with a return to the equity holder that is:
>
> "(a)   Commensurate with the return on investments in other enterprises having corresponding risks; and
>
> "(b)   Sufficient to ensure confidence in the financial integrity of the utility, allowing the utility to maintain its credit and attract capital."

Under the familiar construct of *Springfield Education Assn. v. School Dist.*, 290 Or 217, 226-28, 621 P2d 547 (1980), these are delegative terms. They set out the results that the legislature wants the PUC to achieve and then leave it to the PUC to determine both what the results that the legislature described mean in practice and how to achieve those results. The statute calls on the PUC to balance a number of competing, and potentially conflicting, goals and interests in order to achieve rates that are fair and reasonable, and it gives only the broadest of guidelines for determining what is fair and reasonable. Because of the breadth of the legislature's delegation of ratemaking authority to the PUC, our review of its decisions in the usual case is necessarily limited. As the Supreme Court noted in *Springfield*, the "legislature *** could set utility rates from

---

[18] We quote the statute as amended in 2001. Or Laws 2001, ch 569, § 1. The parties do not assert that that amendment affects our analysis in this case.

time to time by statute, but it does not." *Id.* at 230. Rather, the agency is empowered to regulate and to set rates and, "in so doing, to make delegated policy choices of a legislative nature within the broadly stated legislative policy." *Id.*

Thus, as the PUC and PGE both emphasize, in ORS 756.040(1), the legislature gave the PUC substantial discretion in establishing fair and reasonable rates for regulated utilities. We, like the Supreme Court, have recognized the breadth of the PUC's discretion in several cases. *See, e.g.*, *Katz*, 116 Or App at 309-10; *American Can Co.*, 55 Or App at 462-63. As we noted in *American Can*, the legislature's delegation of authority to the PUC over utility regulation is "subject only to constitutional limits and those of the Commissioner's express, legislatively delegated broad powers." 55 Or App at 461. As a result, our role on review of a PUC decision is generally narrow, "to see that the agency's decision is within the range of discretion allowed by the more general policy of the statute." *Springfield*, 290 Or at 229; *see also* ORS 183.482(8)(b) (establishing conditions on which a reviewing court may remand an agency's order for improper exercise of discretion). We do not second guess the PUC's policy decisions, nor do we reweigh its balancing of the interests involved.

As the PUC itself notes, its authority is not unlimited. The courts, not the PUC, have the ultimate authority to decide the PUC's legal duties under the statutes that govern its actions. *See, e.g.*, *Northwest Climate Conditioning v. Lobdell*, 79 Or App 560, 565, 720 P2d 1281 (1986) (concluding that PUC does not have statutory discretion to fail to regulate utility's provision of incidental services to customers). In the context of this case, for example, the courts have determined that the PUC's inclusion in PGE's rate base of the unamortized Trojan investment was legal error.

The courts, however, remanded the matters involved in this case to the PUC for the PUC to determine in the first instance whether its action had resulted in damage to ratepayers and what, if any, remedy it could provide. *Dreyer*, 341 Or at 285. As the court concluded in *Dreyer*, it was the PUC's responsibility to make that determination in the

first instance. *Id.* The PUC determined that, although the erroneous inclusion of the unamortized Trojan investment did not render the rates unjust or unreasonable, ratepayers were damaged to the extent that the adjustments made to the 1995 to 2000 rates resulted in a remaining Trojan balance as of September 30, 2000, that was $15.4 million less than the $180.5 million used in the UM 989 settlement. The PUC determined that it could remedy that damage by compensating customers in that amount plus the time value of money from October 1, 2000, to the present, resulting in a refund of approximately $33.1 million.

As noted, URP and the CAPs complain that, in view of the PUC's erroneous inclusion of the unamortized Trojan investment in PGE's rate base for the period between April 1, 1995, and September 30, 2000, the PUC had no authority to determine that the rates for that period were nonetheless fair and reasonable; the rates were necessarily unlawful, however just and reasonable they might otherwise be. The PUC rejected that argument, observing that, in *Trojan I*, we held only that the PUC had committed legal error in determining PGE's rates as ordered in UE 88:

> "URP's and the CAPs' position reflects a fundamental misunderstanding of the circumstances under which rates are considered unlawful and the role of the courts in reviewing a Commission order.
>
> "Ratemaking is a legislative act, and the Commission is given broad discretion in setting rates, subject only to statutory and constitutional constraints. Rates are unlawful in three circumstances: (1) rates are unjust and unreasonable; (2) rates are unjustly discriminatory; or (3) rates are confiscatory. In this case no party assets that the rates were unjustly discriminatory or confiscatory. In *Trojan I*, the Court of Appeals did *not* find the rates produced by the UE 88 rate order to be unjust and unreasonable, unjustly discriminatory, or confiscatory. Rather, the court held that the Commission's rate order was based on an error of law—the conclusion that PGE's undepreciated Trojan investment could be included in ratebase, giving PGE the opportunity to collect a *return on* the investment."

(Emphasis in original; footnotes omitted.)

We conclude that the PUC correctly determined that it could exercise its discretion consistently with its general broad authority in rate cases because there was no judicial instruction to the PUC that prevented it from doing so. Thus, the PUC was free to reexamine the rates for the period that included an illegal component to determine what the rates would have been had the PUC correctly proceeded without including the undepreciated Trojan investment in the rate base. Two Oregon cases illustrate the principle that, on remand, the administrative agency applies the correct principle of law and exercises its typical authority absent a directive from the reviewing court: *Kari v. Jefferson County School Dist. No. 509-J*, 120 Or App 99, 852 P2d 235, *rev den*, 318 Or 25 (1993), and *Armstrong v. Employment Div.*, 113 Or App 257, 832 P2d 1233 (1992).

In *Kari*, we reviewed an order of the Fair Dismissal Appeal Board (FDAB) that, for the second time, on remand from the Supreme Court, reinstated a teacher who had been fired after it came to light that her husband had been selling marijuana out of their home. In the first case, *Jefferson County School Dist. No. 509-J v. FDAB*, 102 Or App 83, 793 P2d 888 (1990), *aff'd*, 311 Or 389, 812 P2d 1384 (1991), the school district employer sought review in this court when the FDAB reversed the teacher's dismissal the first time. We reversed the FDAB's decision. *Id.* at 85. The Supreme Court affirmed our holding that the first order was based on an erroneous statutory interpretation and remanded to the FDAB for further proceedings consistent with its opinion. 311 Or at 399.

On remand, the FDAB primarily reasoned that the teacher had not engaged in neglect of duty based on the tenuous connection between her husband's misconduct and her own conduct. *Kari*, 120 Or App at 101-02. When the FDAB again reversed her dismissal, the district petitioned for review, and we affirmed. *Id.* at 99. In doing so, we first noted that the FDAB had misconstrued the statutory term "duty":

> "The essence of both courts' reasoning in reversing the first FDAB order was that the term 'duty' in the statute is an objective one and refers to a teacher's obligation to

the employing district, her students and others. Therefore, it was held that FDAB misconstrued and misapplied the statute, as a matter of law, by defining Kari's duty almost wholly by reference to her personal and family circumstances that, she maintained, were inconsistent with her ability to take measures to prevent her husband's misuse of the house."

*Id*. at 101. Thus, we recognized that the FDAB's first order was based on an erroneous interpretation of the law.

We then rejected the district's arguments that (1) the FDAB erred by "proceeding to re-interpret and apply the statutory term" and instead was restricted to determining "whether dismissal was a permissible penalty for the neglect of duty that the Supreme Court had already found to exist"; and (2) even if the FDAB was to apply the statutory term as explained by the appellate courts, the FDAB's "role on remand was to apply that term as defined by the courts," whereas the FDAB allegedly "defied the appellate courts' interpretation" and had "simply come up with [a] rewritten explanation of the same rationale as its original finding" that the teacher's conduct did not constitute neglect of duty. *Id*. at 102. We explained that the Supreme Court had not foreclosed and could not foreclose the FDAB from performing its duties and that the FDAB acted within the scope of remand:

> "We disagree with the district's reading of the Supreme Court's opinion. It held that FDAB's initial interpretation of 'neglect of duty' was erroneous. It did not—and could not properly—hold that the agency was foreclosed from performing its statutory duty of applying the correct interpretation of the statute to the facts of the case. *See* ORS 342.905(5). The court referred, with evident approval, to our disposition that remanded the case to FDAB to apply the proper interpretation of 'duty' and, in the light of that interpretation, to reconsider whether Kari had neglected a duty."

*Id*. at 102 (internal quotation marks omitted).[19] Our disposition in *Kari*, then, was based in considerable part on our understanding that the agency had statutory duties that it

---

[19] In 1993 when we decided *Kari*, the statute we cited, ORS 342.905(5), stated the FDAB's required determination in the case of a dismissed teacher:

was required to carry out on remand, despite the appellate courts' conclusion that the agency initially had misconstrued the relevant statutory grounds for dismissal and despite the district's contention that the scope of remand was severely restricted as a result.

We decided *Kari* the year after we decided a similar case, *Armstrong*, which involved a community college instructor's unemployment insurance claim. 113 Or App at 259. The instructor did not receive work for an academic term at the community college where she usually worked and so obtained substitute teaching assignments from several public school districts. At the end of the school year, the instructor decided not to substitute teach and did not respond to letters from the school districts stating that they expected to engage her services the next year. *Id.* In its first order, the Employment Appeals Board (EAB) "concluded that claimant did not have reasonable assurance that she would be employed" the next year by the community college or by the public school districts and therefore was entitled to benefits. *Id.* We initially remanded the EAB's order because the board did not clarify how its findings supported the allowance of benefits, and, on remand, the EAB denied the instructor's claim. *Id.* at 260.

On review of the denial of benefits, the instructor argued that the EAB (1) abused its discretion by reversing itself on the lack of reasonable assurance that she would be

---

"When the Fair Dismissal Appeals Board panel has completed its hearing, it shall prepare a written report and send it to the permanent teacher, the district superintendent, the district school board and the Superintendent of Public Instruction. *The Fair Dismissal Appeals Board panel shall determine whether the facts relied upon to support the statutory grounds cited for dismissal are true and substantiated. If the panel finds these facts true and substantiated, it shall then consider whether such facts, in light of all the circumstances and additional facts developed at the hearing that are relevant to the statutory standards in ORS 342.865(1), are adequate to justify the statutory grounds cited. In making such determination, the panel shall consider all reasonable written rules, policies and standards of performance adopted by the school district board unless it finds that such rules, policies and standards have been so inconsistently applied as to amount to arbitrariness.* The panel shall not reverse the dismissal if it finds the facts relied upon are true and substantiated unless it determines, in light of all the evidence and for reasons stated with specificity in its findings and order, that the dismissal was unreasonable, arbitrary or clearly an excessive remedy. * * *."

ORS 342.905(5) (1993) (emphasis added).

employed by the community college and (2) was barred from doing so by the "law of the case" doctrine because the college did not assign error to the contrary finding in the previous review. *Id*. We held that the law of the case doctrine did not apply and that the EAB's authority to modify its findings and conclusions is controlled by ORS 657.290(3). *Id*. at 261. We then quoted the statute, which provided that the EAB had discretion to reconsider its decisions, and further observed that, when we remanded the case for reconsideration, "we did not intend to circumscribe EAB's authority in any way. It had the authority to change its findings and conclusions." *Id*. Thus, although the EAB reviewed the same hearing testimony that it had before it issued its first order, the EAB reversed itself and concluded on remand that the instructor did have reasonable assurance that she would be employed at the college for the fall term, with substantial support in the record. *Id*. at 262.

Like our decision in *Kari*, our decision in *Armstrong* supports the legal principle that a reviewing court defers to the statutory authority that the administrative agency has to conduct proceedings on remand and that the agency may exercise that authority on remand unless the court that remanded the agency's order circumscribed that agency's authority. Accordingly, we hold that, absent a court's instruction to the contrary, an agency has authority on remand to act in accordance with its delegated powers. *See also* Richard J. Pierce, Jr., 3 *Administrative Law Treatise* § 18.1, 1679 (5th ed 2010) ("An agency usually has several options available to it when a court sets aside an agency action and remands the proceeding for further action not inconsistent with the court's decision.").[20]

It is true, as the dissent points out, that this is not the normal rate case. These matters were on review as a result of the PUC's interpretation of two statutes and the effect of those interpretations on the PUC's determination of utility

---

[20] Charles H. Koch, Jr., 3 *Administrative Law and Procedure* § 8.62[1](b), 295 (3d ed 2010), cautions that "[r]arely should a court impose its will on the agency by specific instructions. Usually the best approach is for the court to note the error and allow the agency to correct that error." Indeed, "a reviewing court may be said to arrogate power" if it does not remand to the agency for it to correct any error. *Id*. at § 8.62[1](a), 295.

rates. The courts determined that the PUC had erred in its interpretations, and these matters were remanded to the PUC for the purpose of determining whether the erroneous interpretations had resulted in damages to ratepayers and what, if any, remedy the PUC could provide. However, the remand instructions in *Trojan I*, *Trojan II*, and *Dreyer* did not purport to limit the PUC's authority on remand, either explicitly or implicitly.[21]

In *Trojan I*, we construed ORS 757.355 and ORS 757.140(2) to "disallow the return component that the PUC orders allowed for PGE's investment in Trojan" and said that those statutes were limitations on the PUC's authority to set rates under other general statutes. 154 Or App at 716. Thus, the PUC committed legal error, and two orders were remanded "for reconsideration." And nothing in the disposition in *Dreyer* purports to limit the scope of the PUC's authority. The disposition concerned abatement (so that the PUC could take appropriate action). The last line of the opinion in *Dreyer* states that the court issues "a peremptory writ ordering the circuit court to abate the present actions," and the disposition is "Peremptory writ to issue." 341 Or at 287. Further, in *Trojan II*, we eliminated specific limitations on the PUC's authority that the circuit court's judgment contained. In our disposition, we instructed the circuit court to remand the PUC's order for "reconsideration of issues raised on appeal and cross-appeal." 215 Or App at 376.

We also reject the dissent's assertion that, in *Dreyer*, the court assumed that the plaintiffs had been damaged and that the PUC's only responsibility was to determine the amount of the damage and what remedy the PUC could provide. First, the Supreme Court in *Dreyer* was not operating under the assumption that PGE in fact owed money to ratepayers or had injured ratepayers. As the

---

[21] On review of an order in a contested case, ORS 183.482(8)(a) provides that the reviewing court

"may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, the court shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law."

court recognized, "the PUC proceeding that is underway thus has the potential for disposing of the central issue in these cases, *viz.*, the issue *whether* plaintiffs have been injured (and, *if* they have been, the extent of the injury)." *Dreyer*, 341 Or at 285 (emphasis added). In fact, the court recognized that, "[d]epending on how the PUC responds" in the proceedings on remand already underway, "some or all [of] plaintiffs' claimed injuries may cease to exist." *Id.* That was an observation that came directly after the court described the potential for the PUC to determine whether the plaintiffs had even been injured and, if so, the extent of that injury. *Id.*

Second, the *Dreyer* court understood that what would be occurring at the PUC during the remand proceedings would go far beyond an arithmetical problem. 341 Or at 272. The court described URP's dispute concerning the CUB/PGE settlement as primarily focused "on PGE's selection of $180.5 million as the remaining balance" of PGE's investment in Trojan, although there were other moving parts to the settlement:

> "Specifically, the settlement offset the $180.5 million that purportedly still had not been collected on PGE's Trojan investment balance plus a $47.4 million 'FAS 109' asset (which customers supposedly owed to PGE for accelerated tax deductions that PGE passed through to customers early in Trojan's life) against (1) a 'new regulatory asset' to recover FAS 109 amounts; (2) 45 percent of the proceeds from certain insurance policies; (3) $161.9 million in credits owed by PGE to ratepayers, which apparently had arisen out of the 1996 sale of PGE to Enron, a now defunct Texas conglomerate."

*Dreyer*, 341 Or at 269 n 9. The Supreme Court knew, given that description of the settlement, that the dispute was complex and would not be resolved by having the PUC merely revise the rates and engage in an arithmetical calculation after excising the profit margin on the Trojan investment from the rate base. All of that contradicts the conclusion that the Supreme Court had to have intended on remand that the PUC was to consider solely whether it could provide any remedy and what kind of remedy to allow to ratepayers.

Instead, the PUC was directed to, in essence, correct its error. The PUC undertook that charge in a manner consistent with its statutory responsibility by determining what effect, if any, the inclusion of the unlawful component had on rates. It did so by determining what the pre-October 2000 rates would have been without the unlawful component, and that determination entailed much more than a simple arithmetical calculation.[22] As the PUC explained, the inclusion of the unamortized Trojan balance in PGE's rate base affected the PUC's treatment of other components, including the duration of the amortization period and the amount of the disallowance.

We hold that the PUC's conclusion—that the inclusion of the unlawful component did not cause the rates to be unjust or unreasonable and, therefore, has not resulted in any unrectified damages to ratepayers—was consonant with the remands and with the PUC's responsibility and that the order does not present this court with an occasion to second-guess that conclusion. Specifically as to ratemaking by the PUC, the Supreme Court has noted that it is the legality of the end result of the ratemaking process, and not the legality of each calculation or input used during that process, that controls. In ratemaking, the PUC must exercise its discretion in balancing a multitude of factors and many economic considerations in order to determine the appropriate rates. The judiciary's role is to ensure that the process is proper and that the result meets the broad goals that ORS 756.040 establishes for utility rates. As discussed above, there is no single correct rate, but rather a range of just and reasonable rates, and the selection of a rate within that range is within the PUC's discretion.

C. *Interest*

We move on to consider the CAPs' and URP's remaining arguments. The first of those involves interest. As we held in *Trojan I*, although ORS 757.355 prohibits permitting PGE to receive a return *on* its unamortized investment in Trojan, ORS 757.140(2) requires the PUC to

---

[22] We expressly reject the dissent's suggestion that the nature of the error—the inclusion of a component prohibited by statute—rendered the rates structurally unlawful.

provide for PGE to receive a return *of* that investment. The pre-October 2000 rates met that requirement by including the yearly amortization of the outstanding balance in PGE's expenses and, thus, in its revenue requirement. Because those rates also provided for PGE to receive a return *on* Trojan by including the balance in the rate base, there was no need to adjust the amount of the amortization to reflect the time value of the money that PGE had invested in the plant. In the order on review, the PUC concluded, in a decision that both the CAPs and URP challenge, that removing Trojan from the rate base required including interest, at a rate of a little more than seven percent,[23] on the unamortized Trojan balance as part of evaluating the pre-October 2000 rates.

The PUC explained that the purpose of awarding interest on the unamortized Trojan balance was to permit PGE to receive the time value of the money that was tied up in that amount. It was necessary to grant PGE that interest if it was to recover the actual value of its investment; as the PUC points out, a dollar today is worth more than a dollar a year from today. The alternative to allowing interest on the outstanding balance, in the PUC's view, would have been to permit PGE to recover its entire investment in Trojan over a very short period—possibly just one year. Doing so would have created a serious "rate shock," as the rates for that year would be substantially higher than for the previous and following years, and the PUC would not permit such a shock.

The PUC did not err in allowing PGE interest. It was well within the PUC's discretion to conclude that PGE should receive interest limited to a rate that reflects the money that PGE would otherwise lose because of its inability to invest the value of the Trojan balance elsewhere. Because this issue is directly tied to determining the extent to which including the Trojan balance in the rate base improperly increased PGE's revenue requirements, we conclude that the PUC had the discretion to reach this issue. We also conclude that the interest that it awarded is not a return

---

[23] That rate is substantially less than the rate of return that the PUC had provided when it included the Trojan balance in the rate base.

*on* Trojan that ORS 757.355 forbids. Rather, it is part of the return *of* Trojan that ORS 757.140(2) requires. Our rejection of interest in *Trojan I,* 154 Or App at 714, was based on "interest" being a mere verbal substitute for "rate of return." Under the PUC's present approach, that is not the case. We also conclude that there is substantial evidence to support the PUC's decision as to the amount of interest.[24]

D.  *The PUC's authority to order a utility to issue refunds*

Next, the CAPs, but not URP, also challenge the PUC's decision in response to *Dreyer* that the PUC has the statutory authority under ORS 756.040 to order a utility to issue refunds if it determines that the rates that the utility collected were excessive.[25] During the remand proceedings before the PUC, the CAPs contended that specific grants of statutory authority to the PUC to issue refunds, *see* ORS 757.215(4); ORS 757.215(5), limited the PUC's general broad authority to protect ratepayers. The CAPs also argued that the PUC could not rely on our decision in *Katz* as supporting the PUC's authority to order PGE to issue refunds, contending that the Supreme Court's opinion in *McPherson et al v. Pacific P. & L. Co.,* 207 Or 433, 296 P2d 932 (1956), and this court's opinion in *Pacific Northwest Bell Telephone Co. v. Eachus,* 135 Or App 41, 898 P2d 774, *rev den,* 322 Or 193 (1995), require a narrow reading of *Katz's* holding. The CAPs further argued that a reexamination of rates and an order to a utility to issue refunds constitutes retroactive ratemaking, which is prohibited because of the legislative nature of ratemaking.

The PUC rejected those arguments. The PUC examined the origins and rationales of the judicially created rule against retroactive ratemaking, explaining that the rule is derived from the fact that ratemaking is a legislative

---

[24] We reject without further discussion URP's contentions that the doctrines of judicial estoppel or claim preclusion barred the PUC from awarding interest on the unamortized Trojan balance.

[25] With the exception of this issue, URP and the CAPs generally take the same positions on the issues on appeal. The CAPs argue that the only remedy for the affected ratepayers is to recover the excess in an action against PGE under ORS 756.185. The prevailing party in such an action is entitled to recover attorney fees, except that a prevailing defendant may not recover those fees if the action is maintained as a class action. ORS 756.185(1), (2).

act, and that, like legislation, ratemaking may be applied prospectively only, in the absence of explicit legislative direction to the contrary. As noted, utility rates are based on a utility's anticipated expenses and revenues. The PUC explained that the rule against retroactive ratemaking prohibits a utility regulator from setting rates to allow a utility to recover past losses or to require it to refund past profits, so as to ensure that customers are paying rates that reflect the cost of service at the time the service is provided, and so as to protect utilities by ensuring that past profits cannot be used to reduce future rates. The PUC surveyed state and federal case law and noted that different jurisdictions have different interpretations of the rule. Some jurisdictions interpret it broadly to prohibit not only consideration of past losses and profits in setting future rates, but also to prohibit a regulatory agency from ordering a utility to issue refunds to customers under any circumstance. Other jurisdictions interpret the rule more narrowly, allowing exceptions to remedy procedural mistakes, address extraordinary losses or gains, or allow energy cost adjustment clauses.

Against that backdrop, and given Oregon's statutory scheme, legislative history, and case law, the PUC concluded that, in Oregon, a more narrow interpretation is appropriate. In light of this court's decision in *Katz* and the broad scope of the PUC's authority over rates, the PUC concluded that the rule against retroactive ratemaking is not implicated in calculating and ordering refunds of rates collected in compliance with a rate order that is later overturned on appeal (when the PUC determines upon remand that a refund is required), as long as: (1) the PUC considers only the information in existence at the time of the initial rate order; (2) the PUC does not consider actual utility expenses or revenues in calculating refunds; and (3) the refunds are not effectuated by offsetting future rates. In applying those guidelines to the instant case, the PUC concluded that it had authority to order PGE to issue a refund. The PUC further reasoned that, although, as a general rule, refunds could not be required in the absence of a PUC finding that the error rendered the rates unjust and unreasonable or unjustly discriminatory, under *Katz* and its interpretation of ORS 756.040, the PUC may also order a utility to issue

refunds in other limited circumstances, including when a PUC rate order is determined to be unlawful upon judicial review and the PUC determines on remand that a refund is required to remedy the error.

The CAPs reprise their arguments on judicial review and argue that the PUC lacked statutory authority to order a refund and that it engaged in prohibited retroactive ratemaking. We agree with the PUC's conclusions that it had the authority to order PGE to issue refunds and that it did not engage in retroactive ratemaking.

The PUC's statutory authority, as we noted earlier, is broad. In *Katz*, we held that the PUC had the authority to require a refund when it concluded that the rates that it permitted under a temporary rate schedule were excessive. 116 Or App at 310-11. We found that authority in ORS 756.040 and ORS 756.062(2), which grant the PUC broad powers. *Id.* at 309 n 5. We noted that retroactive ratemaking was not involved; the PUC was not "adjusting for unexpected profits or shortfalls" but instead was ordering the utility "to refund amounts that were overcollected," *id.* at 311, specifically, rates in excess of the utility's revenue requirement, which had been reduced by the PUC. In our view, the same conclusion applies when, after a party's timely and successful challenge to the rates on judicial review, the PUC determines on remand that a refund is appropriate.

The CAPs contend that this court's opinion in *Eachus* has limited *Katz* to its facts. In *Eachus*, the rates had become final before the PUC, on its own motion, began a proceeding to investigate whether the utility's rates were generating excessive revenues. Pending litigation, the PUC refused to change the rates to interim rates, as requested by CUB, so that refunds could be issued pursuant to ORS 759.185 if the rates were determined to be excessive. 135 Or App at 45. On judicial review, we determined that the statutes at issue circumscribed the PUC's authority to declare existing rates to be interim and subject to refunds and that the PUC correctly refused to make that declaration. *Id.* at 49-50. The statute at issue in *Eachus* dealt specifically with the PUC's authority to declare rates to be interim, and

we held that that statute controlled over the PUC's general authority under ORS 756.040.

In this case, unlike in *Eachus*, the rates that the PUC initially allowed were timely and successfully challenged and were then subject to the PUC's reexamination pursuant to the appellate decisions in *Trojan I*, *Dreyer*, and *Trojan II*. Because there was a timely challenge to the rates in this case, they could not become final without a resolution of the challenge by the reviewing courts, even though, under ORS 757.225, they were the rates that PGE was required to charge. In that sense, they are comparable to the temporary rates that we discussed in *Katz*, when we rejected the argument that the PUC's specific statutory refund authority meant that the PUC had only that authority to issue refunds and could not issue refunds under other circumstances. *See Katz*, 116 Or App at 310. Like the PUC, we conclude that *Eachus* did not limit the holding in *Katz* that the PUC's broad authority may include the authority to order a utility to issue refunds in certain exceptional cases.

As for how this implicates the rule against retroactive ratemaking, which the CAPs contend bars the refund that the PUC ordered PGE to make, the PUC concluded that a narrow interpretation of the rule is appropriate in Oregon, consistent with this court's observation in *Katz* of what the rule entails. In *Katz*, we noted that the case did not involve retroactive ratemaking, 116 Or App at 311 n 7, but, to address the dissenting opinion, the majority observed that retroactive ratemaking occurs "when past profits or losses are incorporated in setting future rates" and involves "comparing *authorized* revenues with *actual* revenues and then adjusting for unexpected profits or shortfalls," 116 Or App at 311 (emphasis in original). In contrast, some jurisdictions apply a broad version of the rule against retroactive ratemaking that prohibits any refunds to ratepayers under any circumstances. *See generally* Stefan H. Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings*, U Ill L Rev 983, 1022-26 (1991) (describing the split among jurisdictions taking the broad and narrow views of the rule).

We agree with the PUC that Oregon's version of the rule against retroactive ratemaking is or should be a narrow one. That is consistent with the statutory scheme, which contains specific exceptions to the rule, *see* ORS 757.259; ORS 757.268, and which does not expressly limit rate decisions to prospective application only. It is also consistent with the view of the rule expressed by this court in *Katz*. The rule against retroactive ratemaking in Oregon does not prohibit the PUC from determining that a refund is appropriate when there is a determination on judicial review that a timely appealed rate order is erroneous. We therefore agree with the PUC that, in order not to implicate the rule against retroactive ratemaking, its consideration of whether and what refund is appropriate (1) must be based only on the information in existence at the time of the initial rate order; (2) must not be based on an evaluation of the utility's actual expenses or revenues; and (3) must not be effectuated by offsetting future rates.

The PUC in this case did not engage in retroactive ratemaking because it did not incorporate past profits or losses by PGE to set future rates. The PUC instead looked at information in existence at the time of its initial, erroneous rate order that included a return for PGE on its Trojan investment balance. And, the PUC did not set future rates; it instead determined whether ratepayers had been injured by its error.

Finally, we reject the contention that the Supreme Court's opinion in *McPherson* dictates a different outcome. That case involved a class action suit brought in Lane County Circuit Court by customers of the Mountain States Power Company to recover the amount of a surcharge collected by the utility pursuant to a temporary rate adjustment authorized by the PUC under its emergency powers and implemented to recover the utility's unexpected costs to provide power. The circuit court dismissed the case, and the Supreme Court affirmed, holding that the PUC had authority to order the surcharge and that the PUC's order was effective to establish the surcharge.

In a general discussion of the jurisdiction and authority of the PUC, the Supreme Court in *McPherson*

said that the PUC had exclusive jurisdiction to determine whether rates are unreasonable or unjustly discriminatory under then-existing statutes. 207 Or at 449. The court first examined an earlier railroad regulation case, *O.-W. R. & N. Co. v. McColloch*, 153 Or 32, 55 P2d 1133 (1936), regarding the PUC's jurisdiction.

In *McColloch*, the PUC issued two orders, one of which allowed shippers to recover "reparation awards" from various railroads for charging more for shipments of grain than allowed in rate orders. 153 Or at 34. The railroads brought an action in court to set aside the PUC orders. The Supreme Court held that, under a statute then in effect that allowed the PUC to issue "an order directing the carrier to pay to the complainant * * * the sum found to have been imposed upon or collected from him in violation of" other statutes, *id.* at 45, the complainant had to first make a complaint within the PUC's jurisdiction, *id.* at 46. Because the PUC's statutory jurisdiction at that time did not cover overcharges, which the Supreme Court distinguished from cases of unjust rates, the statute allowing the PUC to order carriers to pay reparations to shippers did not apply. *Id.* at 52.

The court in *McPherson* also said, however, that the PUC "has no authority to award any reparations, either for unreasonable or unjustly discriminatory rates, or for overcharges[.]" 207 Or at 449. Distinguishing *McColloch*, the court explained that the reparations that might have been allowed in *McColloch* had their origins in the railroad statutes that conferred jurisdiction and authority to the PUC to award reparations. 207 Or at 452. In the case of public utilities accused of charging "in excess of the lawfully filed schedule of rates," that is, overcharging, the complainant "must seek redress by proceeding directly in the courts for relief." *Id.* at 453. For a challenge to the "lawfulness of rates alleged to be unreasonable or unjustly discriminatory," on the other hand, the complainant must go to the PUC first. *Id. If* the PUC determined that rates the utility charged were "unjust or unreasonable" or "unjustly discriminatory," then, the Supreme Court said, such rates are "unlawful," and provide the complainant with a cause of

action in court. *Id.* at 452-53. In *McPherson*, the Supreme Court noted that the only issue it had to decide was whether the utility defendant's rate surcharge was pursuant to rate schedules "filed in accordance with the prescribed statutory procedure" and, "therefore, lawfully established rates." *Id.* at 453-54.

Thus, the process that occurred in this case, the remand to the PUC after the courts determined that the PUC had erred as a matter of law by allowing PGE to obtain a return on its investment in Trojan, is both consistent with *Dreyer* and follows *McPherson*. We reject the CAPs' contention, contrary to *McPherson*'s holding that the PUC first determines whether rates are unjust or unreasonable, that the PUC has interfered with proper judicial functions or ousted the courts of jurisdiction through its order.

As for the statement in *McPherson* that the PUC lacked reparation authority, the Supreme Court reviewed only the specific statutes dealing with utilities, which, as the court noted, were located in ORS chapter 757 and contained no specific grant of authority for reparations similar to those in the railroad statutes. 207 Or at 449. To the extent that, like the CAPs, one reads that statement as a blanket rule that the PUC lacks authority to order a utility to provide ratepayers with refunds, an interpretation that is unnecessary, subsequent jurisprudence has cast serious doubt on its continued viability. The Supreme Court denied review of our opinion in *Katz*, which found statutory authority for the PUC to order refunds in ORS chapter 756. Although the denial of review does not necessarily signal agreement with our decision, neither does it lead to an inference of disagreement. And in *Dreyer*, the Supreme Court remanded the case to the PUC for it to consider in the first instance whether the PUC had refund authority. The court had reviewed *McPherson*, 341 Or at 271 n 10, and apparently had concluded that it was not dispositive of the PUC's authority to issue a refund under the circumstances of this case. We conclude that the observation of the court in *McPherson* concerning the PUC's reparations authority in ORS chapter 757 does not preclude the PUC's order in this case.

Accordingly, we conclude that the PUC had the authority to order a refund of the portion of the pre-October 2000 rates, if any, that it determined on remand reflects the inclusion of Trojan in the rate base. For the same reason, the PUC had the authority to order PGE to refund the extra depreciation for which, under the PUC's approach in the order on review, it had received credit in the settlement with CUB.

E. *Statements in the PUC's order concerning the CAPs' damage action*

The CAPs also criticize a number of statements in the PUC's order that suggest that the courts do not have the jurisdiction to grant the relief that the CAPs seek in circuit court. For example, the PUC stated that the circuit court determination on summary judgment in *Dreyer* that PGE is liable for damages

> "clearly infringes on this Commission's exclusive jurisdiction. To conclude that damages were warranted, the court would necessarily be required to conclude that customers paid more than they should have paid for services rendered. A determination that customers paid more than they should have paid for services is inherently a determination that rates were unjust and unreasonable. Courts simply do not have the jurisdiction to make that determination."

So far as we can tell, the PUC's statements that the CAPs challenge either did not play a significant role in the PUC's ultimate actions or did not affect our views of the issues that we have decided. Those statements seem, rather, to express the PUC's views about its own authority, and we express no opinion on those statements.

F. *URP's challenge to the rates implementing the CUB / PGE settlement*

Finally, URP challenges a number of aspects of the PUC's decision on the post-September 30, 2000, rates. To the degree that those challenges are properly preserved and assigned as error, they relate to issues of substantial evidence and of the PUC's discretion in ratemaking. As to the first issue, there is substantial evidence to support the

PUC's factual findings. As to the second, the PUC acted within its extremely broad discretion.

Because the unamortized Trojan balance was removed from PGE's rate base as a result of the CUB/PGE settlement and the PUC's rate order in UM 989, the issue of a return on investment that existed with respect to the pre-October 2000 rates does not exist for the later period, as we discussed above. However, URP argues that the PUC's treatment of other rate elements for PGE rates in the period after September 30, 2000, was erroneous, as URP has similarly argued in its earlier challenge to the post-September 30, 2000, rates before the PUC and in reviewing courts. *See, e.g.*, *Trojan II*, 215 Or App at 366-67. Those rate elements include such items as the treatment of tax deductions, a nuclear electric insurance policy, and construction work in progress. URP also disagrees with the PUC's rejection of its arguments concerning one of the two financial analyses the PUC used to determine that the rates implementing the CUB/PGE settlement were just and reasonable.

The exact methodology that the PUC chose to determine which rates to approve, within a just and reasonable range, is consistent with the PUC's statutory authority, and we will not attempt to engage in the analysis invited by URP, namely, an item-by-item examination of rate elements in the analysis that the PUC used. It is apparent from PUC Order No. 08-487 and the record on remand that the PUC considered briefing and materials from all parties and PUC staff and that the PUC fully considered URP's arguments on remand and rejected them. We reject without discussion URP's remaining assignments.

In summary, in undertaking a comprehensive review of the ratemaking decisions in UE 88 to determine, after correcting the legal error of allowing PGE to recover a return on its Trojan investment in rates for the period between April 1, 1995 and October 1, 1995, what just and reasonable rates would have been and whether ratepayers were harmed by the actual rates they had paid, the PUC did not exceed the scope of its authority on remand, and it did not abuse its discretion in determining that its error did not

result in actual rates that were unjust or unreasonable. The PUC did not abuse its discretion in allowing PGE interest in the return of its unamortized investment in Trojan, and substantial evidence supports the PUC's decision as to the amount of interest. The rule against retroactive rate making does not prohibit the PUC from determining in limited circumstances that a refund is appropriate. The PUC had authority to order PGE to issue a refund to customers upon a determination by the courts that the timely appealed rate order was erroneous and upon the PUC's determination that rates collected were excessive. And, substantial evidence supports the PUC's determination that rates implementing the CUB/PGE settlement are just and reasonable.

Affirmed.

**SCHUMAN, P. J.,** dissenting.

I agree with much of the majority's discussion. My disagreement with the ultimate disposition of the majority stems from my view that the methodology that the PUC adopted to determine whether plaintiffs had been damaged and the nature of any remedy that the PUC could provide went beyond the scope of the remands on the previous judicial reviews.

As the majority has noted, rather than simply examining the impact on the pre-October 2000 rates of including Trojan in the rate base, the PUC concluded that it had the authority on remand to re-evaluate the pre-October 2000 rates to make substantial adjustments to some of the factors, other than the inclusion of Trojan in the rate base, that had gone into making them. In the process, the PUC re-examined and modified several of the decisions that it had made in determining those rates in ways that significantly affected PGE's revenue requirements and, thus, its rates. Specifically, the PUC changed the amortization period for PGE's remaining investment in Trojan from 17 years to 10 years, thus increasing PGE's expenses for each of the years at issue; it awarded PGE interest at a little over seven percent on the Trojan balance to reflect the time value of money; and it restored $37.5 million of the balance that it had previously disallowed.

The net result of the changes was that PGE's revenue requirement for the applicable period was $4.03 million greater than the PUC had provided in the rates. Because the difference was relatively small, the PUC concluded that the pre-October 2000 rates were not unjust or unreasonable. Thus, the PUC concluded, the legal error in including the return on Trojan in calculating the rates did not harm the ratepayers, and there was no need to consider reparations or a refund.

URP and the CAPs argue that the PUC erred, because its only role on remand was to determine the amount by which PGE had overcharged its ratepayers as a result of including the Trojan balance in the rate base. URP and the CAPs argue that, when the PUC considers a factor that the legislative authority, as a matter of policy, has expressly prohibited the PUC from considering, the resulting rates are by that very fact unlawful. The rates are not unlawful because the PUC misapplied one of the many considerations that normally go into ratemaking. Rather, the rates are unlawful because they are outside the authority that the legislature has delegated to the PUC. For that reason, they argue, the question of the overall fairness or reasonableness of the rates does not arise. With an unlawful rate, the only action that the PUC has the authority to take is to determine the amount by which the unlawful factor resulted in an overcharge compared to what the rate would have been without that factor. Thus, the CAPs and URP assert, the PUC acted beyond its authority when it re-evaluated the rates and adjusted its treatment of the legal factors that went into the creation of those rates.

The PUC and PGE respond that the appellate courts, in their previous decisions, did not second-guess the PUC's exercise of its delegated authority to make rates. All that they held, according to the PUC and PGE, was that the PUC had erroneously applied one of the many elements in the ratemaking process. According to the PUC, consideration of an unlawful factor in ratemaking has the same effect as improper consideration of lawful factors, and the PUC's job in such circumstances is to reconsider its previous actions as a package, not in isolation. The PUC argues that the normal

rule—that rates that result from the process are lawful if they are fair and reasonable—continues to apply; it is the result of the process, not the process itself, that matters.

In my view, the previous appellate decisions generally support much of URP's and the CAPs' argument, and the PUC's action in re-evaluating the entire rate structure rather than simply determining the effect on the previously approved rates of including Trojan in the rate base was not within its authority on remand. I therefore dissent.

The heart of the PUC's position is that including an unlawful element, such as a return on PGE's Trojan investment, in a rate determination is no different from assigning incorrect weight to one or more of the many legal elements that the PUC does have discretion to consider. The PUC and the majority rely on the well-established principle that it is the legality of the end result of the ratemaking process, and not the legality of each calculation or input used during that process, that controls.[1] That approach is certainly correct for ordinary ratemaking, and the PUC simply applied it to the circumstances of this case, and it did so retrospectively. In ordinary ratemaking, the PUC must exercise its discretion in balancing a multitude of factors and many economic considerations in order to determine the appropriate rates. The result of such a procedure is likely to be no more than an approximation of the ideal rates, if such rates exist. It is not the role of a court to try to second-guess the complex work that the PUC does in the usual rate case; rather, the court's role is to ensure that the process was proper and that the result fits into the broad goals that ORS 757.040 establishes for utility rates.

---

[1] None of the three cases that the PUC cited to support this position involved using a legislatively forbidden factor to arrive at the rates. *See Duquesne Light Company v. Barasch*, 488 US 299, 314, 109 S Ct 609, 102 L Ed 2d 646 (1989) (economic judgments involved in ratemaking are often hopelessly complex and do not admit of a single correct result); *Federal Power Commission v. Hope Natural Gas Co.*, 320 US 591, 602, 64 S Ct 281, 88 L Ed 333 (1944) (it is not the theory that led to the challenged rates that counts, but the total effect of the rate order; that the method used to reach results may contain infirmities is not important if the order itself is not unjust and unreasonable); *Valley & Siletz R. R. Co. v. Flagg*, 195 Or 683, 699, 247 P2d 639 (1952) (follows *Hope Natural Gas Co.*; end result of a rate order determines its validity, not process by which agency reached that result).

This, however, is not the normal rate case. ORS 757.355 expresses a legislative policy determination that the utility's stockholders, not its ratepayers, shall bear the costs and the risk of property that is not in current use for providing utility service. *See McPherson et al v. Pacific P. & L. Co.*, 207 Or 433, 439, 296 P2d 932 (1956) (losses from utility's failure to collect emergency surcharge from customers in competitive area "shall be borne by the Company's stockholders"); *American Can v. Lobdell*, 55 Or App 451, 454, 638 P2d 1152, *rev den*, 293 Or 190 (1982) (PUC disallows costs that "stockholders alone should bear" in determining utility's costs). Rates that derive in part from a rate base that contains the unamortized Trojan balance will permit PGE to charge ratepayers amounts that the law requires PGE's stockholders to pay. Those rates cannot, as a matter of law, be legal rates. In the lexicon of *Springfield Education Assn. v. School Dist.*, 290 Or 217, 226-28, 621 P2d 547 (1980), the terms of ORS 757.355 are not delegative. Under ORS 757.355, the PUC had absolutely no discretion whether to include the Trojan investment in PGE's rate base. Its role in that regard was not to use its delegated authority to flesh out and apply a broadly stated legislative policy; rather, its role was to follow an explicit and precise legislative policy. As we said in *Citizens' Utility Board v. PUC*, 154 Or App 702, 716-17, 962 P2d 744 (1998) (*Trojan I*),

> "[t]he general grants of authority in ORS 756.040 and other general statutes do not empower PGE to charge or PUC to approve rates of a kind that are specifically contrary to the limitations in ORS 757.355 and ORS 757.140(2)."

The PUC did not misuse its broad discretion; it had no discretion to misuse. The PUC failed to recognize that, and, as a result, the rates that it approved included a single specific and impermissible element—a rate base that unlawfully includes return *on* the unamortized balance of Trojan. The rates that derive from that inclusion are unlawful, not because they are unfair and unreasonable but because they include an unlawful return on Trojan. Remedying that unlawfulness may require single-issue ratemaking, however impermissible it is otherwise. As I

discuss below, that is what the appellate courts anticipated the PUC would do on remand.

In *Trojan I*, we clearly held that the pre-October 2000 rates were unlawful as a result of the inclusion of the return on the Trojan investment. *Trojan I*, 154 Or App at 716 (general grants of authority do not empower the PUC to approve rates that include a rate of return on capital assets that are not currently used for the provision of utility services). However, we remanded the case to the PUC for reconsideration without discussing what it should do on remand.

In contrast, much of the Supreme Court's discussion in *Dreyer v. PGE*, 341 Or 262, 142 P3d 1010 (2006), is directed to the question of the PUC's authority on remand. The case arose out of the CAPs' attempt to obtain a judicial remedy for the alleged excessive charges in the pre-October 2000 rates. As the majority discusses, PGE argued that asking a jury to set the CAPs' damages by determining the rates that the PUC should have set if it had followed ORS 757.355 necessarily would involve ratemaking that would intrude into the PUC's exclusive jurisdiction. The Supreme Court disagreed with that argument:

> "Although a jury theoretically could go about deciding the damage question in the manner suggested, *i.e.,* by determining what a 'fair and reasonable' rate would have been if the objectionable return on Trojan had been excluded and then comparing that rate to the one actually charged during the relevant period, it also could simply attempt to determine what part of the rates that the PUC had approved as 'fair and reasonable' in fact represented a return on PGE's investment in Trojan and, therefore, were unlawful under ORS 757.355 (1993), as interpreted in *Citizens' Utility Board*, 154 Or App 702. The first approach arguably would invade the PUC's exclusive ratemaking authority, but we are not persuaded that the latter approach would involve a similar trespass."

*Dreyer*, 341 Or at 282.[2]

---

[2] The PUC points out that it was not a party to *Dreyer* and that the order that we are reviewing is not an order on remand from that case. Thus, the PUC argues, *Dreyer* does not instruct the PUC to take any particular action. Of course, the PUC filed an amicus brief in *Dreyer*. More significantly, as we recognized in *Utility*

Thus, the Supreme Court suggested two ways to determine the damages that resulted from the PUC's error. The first way would be for *the PUC* to determine what fair and reasonable rates would be if the rate base did not include Trojan. Doing so, the court assumed, would involve excluding the return on Trojan from PGE's revenue requirement for the relevant period, establishing hypothetical rates as a result of the reduced revenue requirement that would follow from that exclusion, and then evaluating the resulting rates for fairness and reasonableness. The difference between what PGE would have received under the hypothetical rates and what it actually received under the rates that the PUC had actually approved would be the CAPs' damages. 341 Or at 282.

The second possible way that the Supreme Court suggested to determine the CAPs' damages was for the PUC or a jury simply to remove Trojan from the rate base, reduce PGE's revenue requirement by the amount of its return on Trojan, and award damages to the CAPs in the amount of the difference. Because the second approach would not require establishing new hypothetical rates or determining whether they were fair and reasonable, it would not invade the PUC's delegated authority. That approach would simply correct the unlawful rates by removing the factor that made them unlawful. *Id.*

The Supreme Court ordered the circuit court to abate the class action under the doctrine of primary jurisdiction, because it concluded that the PUC should decide what remedy it could "offer to PGE ratepayers, through rate reductions or refunds, for the amounts that PGE collected in violation of ORS 757.355 (1993) between April 1995 and October 2000" before the class action proceeded further. *Dreyer*, 341 Or at 286. If the PUC was able to provide a full or partial remedy, then the CAPs either were not injured at all—because they would receive a remedy through the PUC's actions—or their remedy was to seek review of the PUC's order. In the first case, the court could dismiss the class action; in the second,

*Reform Project v. PUC*, 215 Or App 360, 170 P3d 1074 (2007) (*Trojan II*), *Dreyer* expresses the Supreme Court's view of the applicable law and of the options before the PUC in its proceeding on remand from *Trojan I*. That view is binding both on the PUC and on this court.

its work would be usefully curtailed. 341 Or at 285. The Supreme Court concluded that,

> "[i]f the PUC determines that it can provide a remedy to ratepayers, then the present actions may become moot in whole or in part. If, on the other hand, the PUC determines that it cannot provide a remedy, and that decision becomes final, then the court system may have a role to play. Certainly, after the PUC has made its ruling, plaintiffs will retain the right to return to the circuit court for disposition of whatever issues remain unresolved, including the question of a fee award."

341 Or at 286. The entire premise of the Supreme Court's opinion in *Dreyer* was that the ratepayers were entitled to *some* remedy, in *some* venue. The issue was not *whether* the ratepayers could obtain a remedy, but *how* the ratepayers would obtain that remedy, either by a refund or a rate reduction. The court abated the case in order to give the PUC the first opportunity to consider that issue, including whether it had the authority to order a refund or to adjust future rates.

In *Dreyer*, the Supreme Court noted that the circuit court's remand of *Trojan II* required the PUC to

> "'revise and reduce the existing rate structure so as to fully and promptly offset and recover all past improperly calculated and unlawfully collected rates, or alternatively, to order PGE to immediately issue refunds for the full amount of all excessive and unlawful charges collected by the utility for a return on its Trojan investment.'"

341 Or at 284 n 17 (quoting *Trojan II*, 215 Or App at 368). The circuit court had issued that remand while the case was on appeal to this court. In *Trojan II*, we reviewed the remand in light of *Dreyer* and concluded that it was too broad. The circuit court had presumed both that the PUC had the authority to offer a remedy through rate reductions or refunds of previously collected amounts *and* that it was required to exercise that authority. However, the Supreme Court in *Dreyer* had held that there were alternative ways for the ratepayers to recover the unlawfully collected amounts. Whether they should seek a rate reduction or refund, rather than proceeding by a class action against PGE, was a matter

for the PUC to decide in the first instance. *Trojan II*, 215 Or App at 374.

> "[B]efore the circuit court or this court orders the PUC to provide a refund or engage in retroactive ratemaking * * *, the PUC must determine—in the agency proceedings that are currently underway—whether it has authority and will exercise its authority to take those actions."

*Id.* at 375-76.[3] The PUC's authority to require a refund, and its discretionary decision about whether to do so, were thus the fundamental issues on remand.

One foundation of both *Dreyer* and *Trojan II* is that the ratepayers were entitled to reimbursement, in some fashion, for the unlawful rates that PGE charged. Both appellate courts assumed that the proceedings that the PUC was conducting at the time of the decisions, and that ultimately resulted in the order on review in this case, would result in a decision about the extent to which the PUC could or would provide such a refund.

However, the PUC apparently failed to understand the limited issues that were before it on remand. It believed that its responsibility encompassed the authority to determine that the rates that had been imposed, even unlawfully, were nonetheless fair and reasonable and that no damages had been suffered. Throughout the proceedings on remand, the PUC failed to recognize the distinction between rates that are subject to its usual broad discretion and rates that are subject to a specific legislative policy that the PUC has no discretion to ignore. The first rates are subject to challenge primarily if they are not fair and reasonable as a whole, and the PUC's role on remand is to adjust them to be fair and reasonable. In my view, however, the second rates are unlawful no matter how fair and reasonable they may be, and the PUC's role on remand is to determine a remedy

---

[3] Our reference to "retroactive ratemaking" was in the context of the Supreme Court's statement that "the issue of the PUC's authority to provide a retroactive remedy is one that, at least initially, belongs before that body." *Dreyer*, 341 Or at 285 (quoted and emphasized in *Trojan II*, 215 Or App at 375). The issue that we addressed in *Trojan II* was whether the PUC had the authority to provide a remedy—such as by adjusting the post-October 2000 rates—for excessive rates that PGE had already collected, not how it might reconsider the foundations of those rates.

for that unlawfulness. It was not the PUC's role to revisit its previous ratemaking but rather to determine whether it had the authority to order an appropriate remedy for the unlawfulness of the rates, whether in its discretion it would do so, and, if it did, what the remedy should be.[4] I would conclude that the PUC erred on remand by evaluating the rates according to the first criterion rather than the second. For that reason, I would reverse its order on the pre-October 2000 rates and remand the case for further proceedings. In all other respects, I agree with the majority.

---

[4] The PUC correctly states that it technically did not engage in retroactive ratemaking because it did not consider past profits and losses in evaluating the rates. *See Pacific Northwest Bell Telephone Co. v. Katz*, 116 Or App 302, 311, 841 P2d 652 (1992), *rev den*, 316 Or 528 (1993). It did, however, retrospectively change a number of decisions that it had originally made before evaluating the original rates. It did not limit its consideration to the effect of including a return on Trojan on those rates.